**LYNCH CARPENTER LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
1350 Columbia Street, Suite 603
San Diego, CA 92101
Tel:   619-762-1910
Fax:   619-756-6991

*Counsel for Plaintiffs and the Putative Class*

[Additional counsel appearance on signature page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANNAH COUSIN, LINDA CAMUS, and EDWARD BARBAT individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>SHARP HEALTHCARE,<br><br>    Defendants. | Case No.: 22-cv-2040-MMA (DDL)<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Hannah Cousin, Linda Camus, and Edward Barbat (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, assert the following against Sharp HealthCare ("Sharp" or "Defendant") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## NATURE OF THE ACTION

1.       Plaintiffs bring this class action against Sharp for its failure to properly secure and safeguard its patients' sensitive health information, including details about their medical conditions, prescriptions, doctors' appointments, and other content submitted on Sharp's website and related subpages. Between approximately February 2018 and November 2022, Sharp procured and embedded an invisible 1x1 tracking pixel on its

website, www.sharp.com, and subpages, which then deployed on each patients' internet browser for the purposes of intercepting and disclosing Plaintiffs' and other patients' health-related electronic communications with Sharp's website and subpages to Meta Platforms, Inc. ("Meta").

2.     The tracking pixel referred to as the Meta Pixel is a snippet of JavaScript code offered by Meta that can be embedded on a third-party website, such as Sharp's, to track users' actions as they navigate through the website. It logs the pages they visit, the buttons they click, the information they type, and more.[1] The Meta Pixel then sends this harvested information to Meta, where it can be stored for years.[2]

3.     When Sharp intentionally and surreptitiously embedded the Meta Pixel on its website and related subpages, Sharp shared with Meta every patient's interaction with its website and related subpages without Plaintiffs or its patients' knowledge or consent. Meta then aggregated this data across all websites equipped with the Meta Pixel in order to build a dossier of that patient's activity, labeled with the patient's IP address, and matched to the patient's Facebook and/or Instagram account (or lack thereof).[3]

4.     As a result of Sharp's use of the Meta Pixel, Plaintiffs' and Class Members' sensitive health information, including but not limited to information about their healthcare providers and service locations; types of conditions and treatments researched; dates and times of doctor's appointments along with reasons for requesting an appointment, computer IP addresses, and other personally identifying information was disclosed to Meta without their authorization or consent. Additionally, if a patient was logged in to Facebook when they visited Sharp's website and related subpages where the Meta Pixel was embedded, Meta linked their sensitive health information to their Facebook account.

---

[1] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[2] *Facebook Business Tools Terms*, Facebook, https://m.facebook.com/legal/terms/businesstools, (last visited July 20, 2023).
[3] *Id.*

5.     As a healthcare provider, Sharp is required by law to provide every patient with a Notice of Privacy Practices. In its Notice of Privacy Practices, Sharp informs patients that it is "responsible for safeguarding [patients'] protected health information" and that "information about [patients] and [patients'] health is confidential."[4]

6.     Despite Sharp's promise to safeguard and keep confidential its patients' sensitive health information, Sharp nevertheless intentionally chose to embed the Meta Pixel on its website and subpages, sharing Plaintiffs' and Class Members' sensitive health information with Meta without their consent when they communicated with Sharp's website and subpages.

7.     The disclosure of Plaintiffs' and Class Members' sensitive health information enabled Meta to gain intimate insight into the types of medical care and medical treatments patients sought from Sharp.

8.     As described through this First Amended Consolidated Class Action Complaint, Sharp did not reasonably protect, secure or store Plaintiffs' and Class Members' sensitive health information, but rather intentionally and knowingly granted Meta access to confidential patient information that Sharp knew or should have known was unlawful.

9.     Sharp's actions constitute a reckless disregard for the privacy of its patients' sensitive health information and its duties as a healthcare provider, an extreme invasion of Plaintiffs' and Class Members' right to privacy, and violate state statutory and common law.

## **PARTIES**

10.    Plaintiff Hannah Cousin is an adult citizen of the state of California and is domiciled in San Diego, California.

11.    Plaintiff Linda Camus is an adult citizen of the state of California and is domiciled in San Diego, California.

---

[4] *See* https://www.sharp.com/patient/upload/Notice-of-Privacy-Practices_2013-2.pdf, (last visited Nov. 4, 2022).

12.     Plaintiff Edward Barbat is an adult citizen of the state of California and is domiciled in San Diego, California.

13.     Defendant Sharp is a non-profit corporation that operates Sharp Memorial Hospital in San Diego, California. Sharp is San Diego's leading health care provider and operates four acute care hospitals, three specialty hospitals, three affiliated medical groups, and a healthcare plan. Sharp has approximately 2,700 doctors and more than 19,000 employees.

14.     Defendant Sharp is headquartered at 8695 Spectrum Center Blvd., San Diego, California 92123. Sharp is a citizen of California.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

16.     This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, ad acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## FACTUAL BACKGROUND

**A.     How the Meta Pixel Works.**

18.     In 2015, the Meta Pixel was announced as a tool to refine Meta's targeted advertising.

19.     The Meta Pixel is a mechanism that loads JavaScript code which collects detailed and granular data for every interaction on a webpage.[5]

20.     Once a third-party company, advertiser, or other entity sets up the Meta Pixel on a website, the information collecting and sharing begins.

21.     Importantly, Meta designed Meta Pixel such that Meta receives the information about a website user's actions contemporaneously with those actions. This means that as soon as a website user takes any action on a webpage that includes Meta Pixel, it redirects the user's communications to Meta while the exchange of the communication between the website users and the website is still occurring.

22.     In response to congressional questioning in 2018, Meta stated that the Meta Pixel "provide[s] information about users' activities off Facebook—including information about their device, websites they visit, purchases they make, the ads they see, and how they use their services—whether or not they have a Facebook account or are logged into Facebook."[6]

23.     According to Meta, the Meta Pixel can collect anything present in http headers, which include "IP addresses, information about the web browser, page location, document, referrer and person using the website," button click data including "any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks," form field names as well as form field values if selected by the website owner, and other optional values.[7] The Meta Pixel captures at least seventeen standard events including payment info, registration for events, location search information,

---

[5] Surya Mattu, Angie Waller, Simon Fondrie-Teitler, & Micha Gorelick, *How We Built a Meta Pixel Inspector*, The Markup (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.
[6] Facebook, Social Media Privacy, and the Use and Abuse of Data: Hearing Before the Comm. on Com., Sci., and Transp., 94 Cong. 115 (2018) (Post-Hearing Questions).
[7] https://developers.facebook.com/docs/meta-pixel/ (last visited July 28, 2023).

purchases, scheduling information such as appointments, information that was searched for, applications, and what content was viewed.[8]

24.    Meta touts the "retargeting ability of the Meta Pixel," describing how it can help advertisers create "Custom Audiences," tailoring advertisements to "people who have engaged with the page your pixel is on."[9] It also describes how the information harvested by the Meta Pixel can build "Lookalike Audiences," analyzing the information and generating a similar group for targeting.[10]  Lookalike Audiences are intended to "have interests, likes, and demographic stats similar to the people who are already engaging with your website and ads."[11] To do this, Facebook naturally needs to receive and analyze these types of information after they are gathered by the Meta Pixel. Facebook states that "To create a lookalike audience, our system leverages information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities."[12]

25.    Meta Pixel allows third parties to create a library which logs every time a website visitor takes an action (an "event") that the third-party wants to track (a "conversion"). All of these tracked conversions are then stored so that the third-party can analyze the data collected.[13]

26.    There are currently more than six million websites using Meta Pixel.[14] On each of those websites, Meta Pixel collects and sends information to Meta via scripts

---

[8] https://www.shopify.com/blog/72787269-relax-advertising-on-facebook-just-got-a-lot-easier

[9] Ted Vrountas, *What is the Meta Pixel & What Does it Do*?, Facebook Advertising, https://instapage.com/blog/meta-pixel (last visited July 28, 2023).

[10] *Id.*

[11] https://www.shopify.com/blog/72787269-relax-advertising-on-facebook-just-got-a-lot-easier (last visited July 28, 2023).

[12] https://www.facebook.com/business/m/one-sheeters/facebook-pixel-events (last visited July 28, 2023).

[13] *Meta for Developers*, Meta Pixel, https://developers.facebook.com/docs/meta-pixel/, (last visited Nov. 4, 2022).

[14] *Facebook Pixel Usage Statistics*, Built With, https://trends.builtwith.com/analytics/Facebook-Pixel, (last visited Nov. 4, 2022).

running in a person's internet browser. That data is then delivered to Meta in "data packets" labeled with personally identifiable information ("PII"), including the user's IP address.

27.    If a person is not logged in to Facebook at the time, Meta uses personal information a user enters in form fields to match them to their Facebook and/or Instagram profile through a process called Advanced Matching. With this process, Meta collects emails, first and last names, phone numbers, birthdates, and addresses, then uses that information to connect event tracking data to a specific Facebook profile.

28.    Even if a person does not have a Facebook account, has never registered for an account, has never so much as looked at a Facebook or Meta privacy policy, and has no intention to ever join any social media at all, Meta still collects data on that person. When asked by Congress about this maintenance of "shadow profiles" with data of nonusers of Facebook, Mark Zuckerberg responded, "[W]e collect data on people who have not signed up for Facebook for security purposes."[15]

29.    Through this data collection process, Meta is able to provide its marketing partners with direct and detailed insight into individuals' activities, allowing them to track website visitor actions, define custom audiences to better target ads to potential customers,[16] and create lookalike audiences to "reach new people who are likely to be interested in [their] business because they share similar characteristics to [the business's] existing customers."[17] Put differently, once the sensitive health information is intercepted and collected by the Meta Pixel, Meta processes this information, analyzes it, and assimilates it in order to provide targeted advertisements to businesses such as Sharp. Thus,

---

[15] Taylor Hatmaker, *Zuckerberg Denies Knowledge of Facebook Shadow Profiles*, TechCrunch (Apr. 11, 2018), https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/.

[16] 43 *Get Started*, Meta for Developers, https://developers.facebook.com/docs/graph-api/get-started/ (last visited July 28, 2023).

[17] *About lookalike audiences*, Meta Business Help Center, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited July 28, 2023).

upon information and belief, Meta regularly viewed and used the sensitive health information collected by the Meta Pixel in connection with providing targeted advertising.

**B.     The Meta Pixel Has Secretly Been Collecting Sensitive Health Information from Healthcare Provider Patient Portals.**

30.     A 2022 investigation by The Markup found that the Meta Pixel is embedded on the websites of 33 of Newsweek's top 100 hospitals in the United States.[18] The Markup's investigation revealed that the Meta Pixel iterations installed on hospitals' websites have been collecting patients' sensitive health information—"including details about their medical conditions, prescriptions, and doctor's appointments"—and sending it to Meta.[19] This packet of data collected by the Meta Pixel is connected to a patient's IP address, providing Meta with an intimate receipt of information that can be used in combination with other data to identify a specific individual or household.[20]

31.     Most shocking, however, is that The Markup discovered that Meta Pixel is installed inside the password-protected patient portals of seven health systems.[21] The data Meta Pixel surreptitiously collected from patients' interactions with these patient portals included the names of their medications, descriptions of their allergies, and details about their upcoming doctor's appointments. [22]

32.     The Markup identified Sharp Memorial Hospital as one of 33 hospitals found to have the Meta Pixel collecting and sending patient details to Meta.[23]

33.     While Sharp claims that it did not send any personally identifiable information to Meta through the Meta Pixel, this is highly unlikely. Following the Markup's investigation, many of the hospitals and health systems that were found sending patient

---

[18] Feathers et al., *supra* note 1.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Feathers et al., *supra* note 1.

data to Meta had removed or disabled the Meta Pixel on their websites.[24] Three health systems even issued data breach notifications to their patients, warning them that their sensitive health information may have been shared with Meta.[25] The health systems said that the compromised information could include patient names, addresses, IP addresses, details about appointments, information about allergies, vaccination status, and communications with healthcare providers.[26]

34.     Further, Meta's own history privacy deficiencies weigh against Sharp's claims. While Meta purports to "hash" patients' sensitive health information—obscuring them through a form of cryptography—before sending the information to Meta, the hashing does not prevent Meta from using that data. "Meta explicitly uses the hashed information to link pixel data to Facebook profiles."[27]

35.     In any event, the Federal Trade Commission ("FTC") has noted that "significant research has shown that 'anonymized' data can often be re-identified,

---

[24] Todd Feathers & Simon Fondrie-Teitler, *Senator Questions Zuckerberg About Facebook's Collection of "Sensitive Health Information,"* The Markup (Oct. 20, 2022), https://themarkup.org/pixel-hunt/2022/10/20/senator-questions-zuckerberg-about-facebooks-collection-of-sensitive-health-information.

[25] *Notice of Data Breach*, Advocate Aurora Health, https://www.advocateaurorahealth.org/pixel-notification/, (last visited Nov. 4, 2022); *WakeMed News Releases*, WakeMed (Oct. 14, 2022), https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident; *Your Medical Privacy is Out Top Priority*, Novant Health, https://www.novanthealth.org/home/privacy-statement/pixel.aspx?utm_source=all&utm_medium=pixel&utm_campaign=Vanity%20URL, (last visited Nov. 4, 2022).

[26] Feathers et al., *supra* note 24.

[27] Feathers et al., *supra* note 1.

especially in the context of location data"[28] and former FTC Chief Technologist Edward Felten has found that "hashing is vastly overrated as an 'anonymization' technique."[29]

36.     Similarly, security experts have also indicated that if user data is transmitted to Meta, "the hash method is not suitable for generating anonymous character strings."[30] This is because "Meta explicitly uses the hashed information to link pixel data to Facebook profiles."[31] During an interview with congressional staff, Meta admitted as much when it indicated that that it will match email addresses collected by the Meta Pixel to email addresses that Meta has on file.[32] Meta's "c_user cookie" also enables Meta to connect the information collected by the Meta Pixel to specific Facebook profiles, thus allowing it to build dossiers on Facebook users.

37.     Moreover, Meta claims that "[i]t is against our policies for websites and apps to send sensitive information about people through our Business Tools," which includes its advertising technology, and its "system is designed to filter out potentially sensitive data it detects."[33] However, Meta told investigators from the New York Department of Financial Services that its filtering system was "not yet operating with complete accuracy," according

---

[28] Kristen Cohen, *Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data*, Fed. Trade Comm'n (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.

[29] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Fed. Trade Comm'n (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous.

[30] *Attacks on Privacy*, *supra* note 16, at p. 14.

[31] Feathers et al., *supra* note 1.

[32] Offices of Sen. Elizabeth Warren, Ron Wyden, Richard Blumenthal, Tammy Duckworth, Bernie Sanders & Sheldon Whitehouse, & Representative Katie Porter, *Attacks on Tax Privacy: How the Tax Prep Industry Enable Meta to Harvest Millions of Taxpayers' Sensitive Data* (July 2023), https://www.warren.senate.gov/imo/media/doc/Attacks%20on%20Tax%20Privacy_Final.pdf, at p. 14.

[33] Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, The Markup (June 15, 2022), https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients.

to the department's February 2021 final report.[34] And more recently, The Markup and Reveal's joint investigation found that Meta's sensitive health information filtering system did not block information about appointments a reporter requested with crisis pregnancy centers.[35]

38.     Further, while Meta has an official, albeit ineffective, policy prohibiting the collection of sensitive health information, "it's unclear what if anything, the platform does to educate its advertising clients about the policy and proactively enforce it."[36]

39.     Meta's failure to properly screen data the Meta Pixel collects and prevent it from collecting sensitive health information, however, should come as no surprise. According to a leaked internal document, Meta engineers on the ad and business product team wrote: "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[37] In other words, as explained by Johnny Ryan a privacy activist and senior fellow at the Irish Council for Civil Liberties, "[t]his document admits what we long suspected: that there is a data free-for-all inside Facebook and the company has no control whatsoever over the data it holds."[38]

40.     Indeed, David Holtzman, a health privacy consultant stated he is "deeply troubled by what [the] hospitals are doing with the capture [patient] data and the sharing

---

[34] New York Department of Financial Services, *Report on Investigation of Facebook Inc. Data Privacy Concerns* (Feb. 18, 2021), https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf, at 11.

[35] Oldham & Mehrotra, *supra* note 33.

[36] *Id.*

[37] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, Vice (Apr. 26, 2022), https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[38] *Id.*

---

of it."[39] He further indicated that the hospitals' use of the Meta Pixel "is quite likely a HIPAA violation."[40]

**C.    How Sharp Discloses Plaintiffs' and Class Members' Sensitive Health Information and Aides and Abets Meta with Intercepting and Eavesdropping on Patients Electronic Communications.**

41.    Sharp operates the website and related subpages of www.sharp.com. Sharp's website enables patients to search for doctors and medical services Defendant makes available across San Diego County; search for provider locations; schedule doctor's appointments; and search for webpages that address specific symptoms, health conditions, and/or treatments.

42.    Sharp's website and related subpages are considered "unauthenticated webpages" because they do not require patients to log in before they can access the website and related subpages.

43.    Upon information and belief, Sharp intentionally embedded the Meta Pixel on its website and related subpages from approximately February 2018 to November 2022.

44.    Through the Meta Pixel, Sharp shared its patients' identities and online activity, including information and search results related to their private medical treatment.

45.    For example, when a patient enters www.sharp.com/hospitals/memorial and searches for a doctor, they select the "Find a Sharp Memorial doctor," which takes them to the "San Diego Doctors" page.

---

[39] Feathers et al., *supra* note 1.
[40] *Id.*



**_Figure 1._** Image of www.sharp.com/hospitals/memorial's landing page



**_Figure 2._** Defendant directs patients to its "San Diego Doctors" webpage.

46.     If a patient selects the pre-determined filters on Defendant's website or uses the websites' general search bar or chat, the terms and phrases are transmitted to Meta, even if they contain a patient's treatment, procedures, medical conditions, and related queries.



***Figure 3*** [41]

47.     Patients may also conduct searches through filters that allow them to narrow search results based on distance from a particular location, "Specialty," "Appointment Options," and "Medical Group." Patients can also narrow their search results based on the provider's gender and spoken languages.

---

[41] On information and belief, the text users type into the search bar is transmitted and included in the web address and URL that corresponds with the search results. *See, e.g.*, https://www.sharp.com/search/?q=cardiovascular (last accessed Nov. 29, 2022).





*Figures 4 & 5*

48.     After taking any of these actions on the Find a Doctor page, patients are subsequently directed to the provider search results page, and their selections or search parameters are automatically transmitted.



***Figure 6.*** Defendant's provider search results webpage identifies doctors that fit the patient's search criteria.

49.     Without its patients' knowledge or consent, Defendant's tracking pixel recorded and transmitted their communications and interactions with www.sharp.com, including patients' PII and protected health information ("PHI"), and automatically sent the information to Meta.

50.     On information and belief, and using the following example and images below, the information transmitted to Meta includes: (1) the patient's unique and persistent Facebook ID (c_user ID); (2) the fact that the patient clicked on a specific provider's profile page ("Dr. Ronald Sanzone" in the example below), (3) the patient's search parameters (demonstrating they specifically searched for a "male" doctor who accepts "Aetna HMO" insurance, speaks "Spanish," and is specialized in "family medicine,"), and (4) the patient's

location filter (demonstrating the patient sought a provider located in or around the "92113" zip code).



***Figure 7***

51.    Figure 7 is a screenshot that was taken from www.sharp.com before the Defendant removed the tracking pixel from its website. The first line of highlighted text "GET" refers to an HTTP GET request.

52.    HTTP requests and HTTP responses are ongoing back and forth communications that occur as a website visitor interacts with the website. The user's web browser sends an HTTP request to Defendant's server, and the server returns an HTTP response that loads the particular webpage or information the website visitor has requested. A GET Request is a specific type of HTTP request which communicates additional information, including cookies. This is particularly relevant in this case because, as the red highlight in Figure 7 demonstrates ("c_user=10006552172 . . ."), the information Meta recieves from Defendant actually includes the website visitor's unique and persistent Facebook ID, thereby revealing their identity and allowing their PHI to be linked to them individually.

53.    The second line of highlighted text ("/tr/?id=22077908661188660") is also important because it contains Defendant's unique and persistent Meta Pixel id, which

demonstrates that the pixel was indeed located on this particular webpage and other portions of its website.

54.    In the example above, the user's action on the website is recorded and transmitted to Meta as a page view (highlighted in Figure 7 as "ev=PageView"), thereby communicating the fact that the website visitor viewed this specific webpage.

55.    The text "referer: https://www.sharp.com" is significant because it demonstrates that Facebook received the information from Defendant's website.

56.    Defendant also encouraged its patients to use the website for booking medical appointments, and the "book appointment" button located on a particular doctor's profile page facilitated this process. This feature helped Defendant save money on scheduling costs, but it simultaneously divulged its patients' PII and PHI to Meta, including information concerning their medical appointments and information revealing the identity of their physician.

57.    When patients clicked the "Book Appointment" button, Defendant's pixel recorded and shared the activity with Meta as a "SubscribedButtonClick," thereby communicating the fact that the patient booked or attempted to book an appointment with a specific doctor.

id: 2207790866118660
ev: SubscribedButtonClick
dl: https://www.sharp.com/san-diego-doctors/dr-ronald-sanzone-57403
rl: https://www.sharp.com/
if: false
ts: 1646130677927
cd[buttonFeatures]: {"classList":"button full-width consistensea text-center ng-star-inserted","destination":"","id":"schedule-by-phone-link","imageUrl":"","inner text":"Book appointment","numChildButtons":0,"tag":"a","name":""}
cd[buttonText]: Book appointment
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Dr. Ronald Sanzone | San Diego - Sharp HealthCare"}
cd[parameters]: []
sw: 1920
sh: 1080
udff[zp]: 51764ffbf0cf2ca6e16af3ab55fa4635712ac938ec6b3cff28ccba20e3fabbef
v: 2.9.52
r: stable
ec: 38
o: 2078
fbp: fb.1.1645966677191.436723939
it: 1646130076252
coo: false
es: automatic
tm: 3
rqm: GET

**Figure 8**

58.     Figure 8 is a screenshot that was taken from www.sharp.com before the Defendant removed the tracking pixel from its website. As with the previous example, the lines of text include Defendant's pixel id ("id: 22077908661188660"), and "GET" confirms that the information was sent to Meta alongside the user's Facebook ID. Additional text reveals the identity of the patient's physician (highlighted in yellow as "dr-ronald-sanzon") and the fact that the user scheduled or attempted to schedule an appointment with this particular physician ("ev:SubscribedButtonClick," "Text: Book Appointment," and [buttonText]: Book appointment).

59.     Similarly, each doctor's profile page provides a direct link that allows a patient to call the doctor's office, and, upon clicking the telephone number button, the patient's click is shared with Meta as a subscribed button click.

Id: 22077908661188660
ev: SubscribedButtonClick
dl: https://www.sharp.com/san-diego-doctors/dr-ronald-sanzone-57403
rl: https://www.sharp.com/
if: false
ts: 1646130681129
cd[buttonFeatures]: {"classList":"fad-doctors-phone-link","destination":"tel:+16195277700","id":"","imageUrl":"","innerText":"619-527-7700","numChildButtons":0,"tag":"a","name":""}
cd[buttonText]: 0-0-0
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Dr. Ronald Sanzone | San Diego - Sharp HealthCare"}
cd[parameters]: []
sw: 1920
sh: 1080
udff[zp]: 51764ffbf0cf2ca6e16af3ab55fa4635712ac938ec6b3cff28ccba20e3fabbef
v: 2.9.52
r: stable
ec: 39
o: 2078
fbp: fb.1.1645966677191.436723939
it: 1646130076252
coo: false
es: automatic
tm: 3
rqm: GET

*Figure 9*

60.     This time, the data transmission reveals the identity of the patient's physician ("Dr. Ronald Sanzone"), the fact that the user called or attempted to call his office ("ev: SubscribeButtonClick"), and the physician's phone number ("doctor's-phone-link" and "tel: +16195277700"). Each time Defendant sends this activity data, it also discloses a patient's personally identifiable information.

61.     A user who accesses Defendant's website while logged into Facebook will have the c_user cookie transmitted to Meta, which contains that user's unencrypted Facebook ID. Some of the cookies Meta may receive are visible here:

| presence | C%7B... | .facebook.com |
| xs | 3%3Ar... | .facebook.com |
| c_user | 10003... | .facebook.com |
| fr | 00ZpYJ... | .facebook.com |
| datr | MalzYj... | .facebook.com |
| sb | qqAzY... | .facebook.com |

**Figure 10**

62.     When a visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a smaller set of cookies.[42]

| fr | 00Zp... | .facebook.com |
| wd | 1156... | .facebook.com |
| sb | qqAz... | .facebook.com |
| datr | Malz... | .facebook.com |

**Figure 11**

63.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[43] Meta, at a minimum, uses the fr cookie to identify users.[44] At each stage, Defendant also utilizes the _fbp cookie, which attaches to a browser as a first-party cookie, and which Meta uses to identify a browser and a user.[45]

64.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook or it is otherwise used to visit the same website.[46]  If that happens, the time resets, and another 90 days begins to accrue.[47]

---

[42] Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

[43] *Facebook Ireland Ltd: Report of Re-Audit,* DATA PROTECTION COMMISSIONER (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[44] *Cookies Policy,* FACEBOOK, https://www.facebook.com/policy/cookies/ (last visited Nov. 29, 2022).

[45] *Id.*

[46] *Id.*

[47] Confirmable through developer tools.

65.     The Meta Pixel uses both first and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., www.sharp.com.[48] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[49] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

66.     Meta, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles, and, as shown in the above figures, Defendant sends these identifiers alongside the event data.

67.     To make matters worse, every phrase and word patients typed into the website's general search bar was also sent to Meta via Defendant's pixel, and the image below evidences this fact.

:authority: www.facebook.com
:method: GET
:path: /tr/?id=2207790866118660&ev=PageView&dl=https%3A%2F%2Fwww.sharp.com%2Fsearch%2F%3Fq%3Dhiv%2520testing&rl=https%3A%2F%2Fww
w.sharp.com%2F&if=false&ts=1646906402362&sw=1920&sh=1080&v=2.9.55&r=stable&ec=0&o=30&fbp=fb.1.164596667/191.436723939&it=1646
906401808&coo=false&exp=p0&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9,he-IL;q=0.8,he;q=0.7
cookie: sb=XqIUYhuD4Fgj8Hz0a5cze9C4; datr=XqIUYmTRh1ryqmLwNc1dfKhA; c_user=1000655217X    ; xs=38%3ArI1vHX4epoEqFw%3A2%3A164595
4017%3A-1%3A15115; fr=0iOBEsuBqDQNhZGUa.AWVTRM_yq1OFqikfA_9H_7WTJSQ.BiFJnN.8V.AAA.0.0.BiJIEb.
referer: https://www.sharp.com/
sec-ch-ua: " Not A;Brand";v="99", "Chromium";v="98", "Google Chrome";v="98"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/98.0.4758.102 Safari/537.3
6

***Figure 12***

---

[48] *First-party cookie*, PC MAG, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last visited Nov. 29, 2022). This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[49] *Id.* This is also confirmable by tracking network activity.

68.   In Figure 12, the user typed the phrase "hiv testing" into the general search bar located on www.sharp.com, and that exact phrase was transmitted to Meta via Defendant's pixel ("search" and "hiv . . testing"). Likewise, phrases such as "I have dementia," "I need help with drug addiction," and "preparing for my upcoming colonoscopy" were communicated to Meta via Defendant's Pixel.

**D.   Plaintiffs' and Class Members' Experience.**

69.   Plaintiffs and Class Members fell victim to Sharp's unlawful sharing of sensitive health and personal information with Meta. Plaintiffs and Class Members are all patients of Sharp, have used Sharp's website and related subpages, and have been treated at one of Sharp's locations.

***Plaintiff Cousin's Experience***

70.   Plaintiff Cousin has been a patient at Sharp since approximately 2017. ████████████████████████████████████████████. Plaintiff Cousin is also a Facebook user.

71.   Plaintiff Cousin has used Sharp's website and related subpages to search for a find her primary care physician. Plaintiff Cousin selected her primary care physician by using the "Find a Doctor" tab on Sharp's website.

72.   Plaintiff Cousin communicated with Sharp's website while searching for her primary care physician by filtering Sharp's physician directory by physician specialty, availability (accepting new patients), and the physician's philosophy of patient care and then clicking on the button "View my results." Plaintiff Cousin further communicated with Sharp's website by clicking on the profiles of various Sharp physicians where her browser was then directed to the physicians' specific webpages where Plaintiff Counsin view their biographies, credentials, patient reviews, and practice locations by clicking on various drop-down buttons.

73.   While Plaintiff Cousin searched for primary care physicians, Plaintiff Cousin reasonably expected that her online communications with Sharp were confidential, solely between herself and Sharp, and would not be transmitted to or intercepted by a third party.

74.     Unknown to Plaintiff Cousin, Sharp intentionally procured and used the Meta Pixel, allowing it to have access to Sharp's website and related subpages. The Meta Pixel utilized this access to surreptitiously gather Plaintiff Cousin's search for a primary care physician, connect it to her Facebook profile, and share it with Meta. Sharp facilitated this interception without Plaintiff Cousin's knowledge, consent, or authorization.

***Plaintiff Camus' Experience***

75.     Plaintiff Camus has been a patient of Sharp for approximately 15 years. Plaintiff Camus is also a Facebook user.

76.     ███████████████████████████████████████████ ███████████████████████████████████████████.

77.     ███████████████████████████████████████████ ██████████████████████████████. Plaintiff Camus searched for ████████ by using the "Find a Doctor" tab on Sharp's website.

78.     Plaintiff Camus has communicated with Sharp's website ████████ ████████ by filtering Sharp's physician directory ███████████████ and availability (accepting new patients).

79.     Plaintiff Camus has also used Sharp's website and related subpages ████████ ███████████████████.

80.     Plaintiff Camus communicated with Sharp's website by using the website's search bar to ███████████████████████████████████████████ ████████████.

81.     Plaintiff Camus has also used Sharp's website and related subpages ████████ ███████████████████████. Plaintiff Camus communicated with Sharp's website by selecting the physician, a time for her visit, the appointment type, her date of birth, and inputting the reason for her visit along with other information.

82.     While Plaintiff Camus ███████████████████████████████████ ███████████████████████████████████, Plaintiff Camus

reasonably expected that her online communications with Sharp were confidential, solely between herself and Sharp, and would not be transmitted to or intercepted by a third party.

83.   Unknown to Plaintiff Camus, Sharp intentionally procured and used the Meta Pixel, allowing it to have access to Sharp's website and related subpages. The Meta Pixel utilized this access to surreptitiously gather Plaintiff Camus' ██████████████████ ███████████████████████████, and information about her doctor's appointment, connect such information to her Facebook profile, and share such information with Meta. Sharp facilitated this interception without Plaintiff Camus' knowledge, consent, or authorization.

**Plaintiff Barbat's Experience**

84.   Plaintiff Barbat has been a patient of Sharp for over 10 years. Plaintiff Barbat also has a Facebook account.

85.   ████████████████████████████████████ ████████. Plaintiff has used the Sharp website to search for █████████████████ █████████████████████████████████████.

86.   Plaintiff Barbat communicated with Sharp's website by using the website's search bar to ████████████████████████████████████ █████████████.

87.   While Plaintiff Barbat searched for ████████████████████ ███████████████████████, Plaintiff Barbat reasonably expected that his online communications with Sharp were confidential, solely between himself and Sharp, and would not be transmitted to or intercepted by a third party.

88.   Unknown to Plaintiff Barbat, Sharp intentionally procured and used the Meta Pixel, allowing it to have access to Sharp's website and related subpages. The Meta Pixel utilized this access to surreptitiously gather Plaintiff Barbat's ███████████████ ████████████████████████████████, connect such information to his Facebook profile, and share such information with Meta. Sharp facilitated this interception without Plaintiff Barbat's knowledge, consent, or authorization.

89.     Like Plaintiffs, each Class member utilized Sharp's website and related subpages to search for doctors and/or medical conditions, symptoms, or treatment, and schedule doctor's appointments while the Meta Pixel embedded was embedded, and the Meta Pixel intercepted the Class members' sensitive health information by sending it to Meta.

90.     The sensitive health information intentionally collected and disclosed by the Meta Pixel was content generated through Plaintiffs' and Class Members' use, interaction, and communication with Sharp's website concerns the substance of Plaintiffs' and Class Members' communications Sharp. This information is "content" as defined by the privacy statutes herein and is not merely record information regarding the characteristics of the message that is generated in the course of the communication, nor is it simply information disclosed in the referrer headers. The mere fact that the Meta Pixel captures this information and that Meta values this information to gain insight on intimate details about patients' health confirms that the sensitive health information is content that conveys substance and meaning to Sharp and Meta.

91.     As such, Sharp's procurement and use of the Meta Pixel to intercept and share Plaintiffs' sensitive health information is a wiretap in violation of California statutory and common law as Sharp aided and abetted Meta in wiretapping and/or eavesdropping on Plaintiffs' and Class Members' electronic communications with Sharp's website and related webpages.

**E.    Plaintiffs and Class Members Have a Reasonable Expectation of Privacy Regarding Their Data, Specifically Regarding Their Sensitive Health Information.**

92.     Plaintiffs and Class members have a reasonable expectation of privacy in their data communicated to Sharp, including personal information and sensitive health information.

93.     As one law professor from the University of Michigan put it, the Meta Pixel's surreptitious collection of sensitive health information "is an extreme example of how far the tentacles of Big Tech reach into what we think of as protected data space."[50]

94.     Another law professor characterized Sharp's actions as "totally outside of the expectations of what patients think the health privacy laws are doing for them."[51]

95.     Sharp is an entity covered under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq*. ("HIPAA"), which sets minimum federal standards for privacy and security of PHI.

96.     Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

97.     Under C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

98.     PHI includes information a patient may provide to a HIPAA regulated entity while using the regulated entity's website. Such PHI can include a patient's "***medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique***

---

[50] Feathers et al., *supra* note 1.
[51] *Id.*

*identifying code*."[52] This information is PHI "even if the individual does not have an existing relationship with the regulated entity and even if the [individually identifiable health information], such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[53] "This is because, when a regulated entity collects the individual's [individually identifiable health information] through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[54]

99.   HIPAA requires Sharp to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. §§ 164.102, *et seq.*

100.   HIPAA further prohibits a healthcare provider from disclosing PHI with third parties, such as Meta, except where an individual has expressly consented in advance to the disclosure or under certain HIPAA-compliant contracts. 45 C.F.R. §§ 164.502 & 164.508.

101.   In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), Health and Human Services ("HHS") has confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on unauthenticated

---

[52] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept' of Health & Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#ftn19 ("HHS Privacy Bulletin").
[53] *Id.*
[54] *Id.*

webpages, such as Sharp's use of the Meta Pixel on its website and related subpages.[55] Specifically, HHS has explained that tracking technologies embedded on a healthcare provider's unauthenticated webpages that "addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances."

102.   For example, HIPAA's privacy rules apply when "tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider."[56]

103.   To be sure, the HHS Privacy Bulletin is not a pronouncement of new law, but instead reminded covered entities and business associates of their longstanding obligations under existing guidance. The HHS Privacy Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have existed for decades.[57]

104.   On June 20, 2023, HHS reaffirmed that HIPAA's privacy rules apply "when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI" and further reminded HIPAA regulated entities that they "are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other

---

[55] *Id.*

[56] *Id.*

[57] For example, "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000).  "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002).  It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***"[58]

105.    Upon information and belief, Sharp did not obtain Plaintiffs' and Class members' express consent to share their sensitive health information nor have Sharp or Meta entered into a HIPAA-compliant contract that would permit such sharing.

106.    Given the application of HIPAA to Sharp, and that Plaintiffs and Class members must entrust their sensitive health information to Sharp in order to receive care, Plaintiffs and members of the Class had a reasonable expectation of privacy in their sensitive health information provided to Sharp.

## F.    Sharp Violated Industry Standards.

107.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

108.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

109.    AMA Code of Ethics Opinion 3.1.1 provides: "Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]"

110.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes

---

[58] *Use of Online Tracking Technologies*, U.S. Dep't Health & Human Services (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

111.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[59]

**G.   Plaintiffs and Class Members Do Not Consent to Sharp's Sharing of Their Data With Meta.**

112.   Plaintiffs and Class members have no idea that Sharp was sharing their sensitive health information when they interact with its website and appointment scheduling page because the Meta Pixel is seamlessly incorporated into the background as the Meta Pixel is an invisible 1x1 tracking pixel.

113.   For instance, when Plaintiffs interacted with Sharp's website and relate subpages, there was no indication that the Meta Pixel was embedded or that it would track and collect their sensitive health information. Indeed, neither the website's Privacy Policy nor its Terms of Use disclosed Sharp's use of the Meta Pixel or that the Meta Pixel would be disclosing Plaintiffs' sensitive health information to Meta.

114.   Sharp's "Notice of Privacy Practices" indicates that "protecting your privacy is imperative. We have strict policies and procedures in place to keep your personal health information private, and every Sharp employee is educated on how to ensure that information remains confidential."[60] It then contains vague uses of patients' personal information, none of which state Sharp will share confidential medical and personal information with Meta.

---

[59] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited August 2, 2023).

[60] *Notice of Privacy Practices*, Sharp, https://www.sharp.com/patient-rights-privacy/privacy-practices.cfm, (last visited Nov. 4, 2022).

115.    Moreover, while Meta purports to maintain a "Data Policy" that vaguely states under a buried heading "Information from partners" that its "partners provide information about your activities" including "websites you visit," Plaintiffs and Class members would not have a reason to visit or have read Meta's website, let alone its Data Policy, when scheduling appointments or inputting medical information intended their Sharp.

116.    Even if Plaintiffs did encounter Meta's Data Policy stating in vague terms that Meta may receive information from "websites you visit," this undescriptive provision would not be understood by any reasonable user to mean that Meta collects and uses sensitive health information provided to Sharp to receive medical services.

117.    Indeed, the collection of Plaintiffs' and Class members' sensitive health information is inconsistent with the remaining provisions of Meta's Data Policy. Meta requires its purported "Partners," including Sharp, "to have the right to collect, use, and share [user's] information before giving it to [Meta]."

118.    But Sharp does not have an unlimited right to share Plaintiffs' or Class members' data. Sharp is a covered entity under HIPAA and HIPAA protects all electronically protected health information a covered entity like Sharp "creates, receives, maintains, or transmits" in electronic form. 45 C.F.R. § 160.103.

119.    Further, HIPAA does not permit the use or disclosure of sensitive health information to Meta for use in targeted advertising without Plaintiffs' and the Class members' express consent unless Sharp and Meta entered into a HIPAA-approved contract. 45 C.F.R. §§ 164.502 & 164.508.

120.    Upon information and belief, however, Sharp did not obtain Plaintiffs' and Class members' express consent to share their sensitive health information with Meta nor have Sharp or Meta entered into a HIPAA-compliant contract that would permit such sharing.

121.    Thus, Sharp did not obtain consent to collect, use, and share Plaintiffs' and Class members' sensitive health information with Meta.

**H.     Sharp Was Aware that Plaintiffs' Data Included Sensitive Health Information.**

122.   Sharp was well aware that by placing Meta Pixel on the appointment scheduling page, it would result in the disclosure and use of Plaintiffs' and Class members' sensitive health information. By design of the Meta Pixel, *i.e.*, sending all interactions on a website to Meta, Sharp knew that its patients' sensitive health information would be sent to Meta when they made appointments or otherwise interacted with the website and/or appointment scheduling page.

123.   One patient portal company, Epic Systems—the software company behind MyChart that provides access to medical records to hospitals—has "specifically recommended heightened caution around the use of custom analytics scripts."[61] Despite this, Sharp chose to embed the Meta Pixel into the appointment scheduling page.

124.   Further, the news is replete with instances of companies sharing sensitive heath information with Meta through the Meta Pixel. For instance, the FTC recently reached a settlement with Flo Health, Inc., arising from allegations that the fertility-tracking app was sharing sensitive health information from millions of its users with marketing and analytics firms, including Meta and Google.[62]

125.   Moreover, Sharp was well aware that Meta's own data collection policies were insufficient to prevent the Meta Pixel from sharing Sharp's patients' sensitive health information with Meta.  In February of 2021, New York State Department of Financial Services found that Meta collected sensitive health information in violation of its own policies. "Facebook acknowledged to DFS that, until DFS commenced its investigation, Facebook routinely obtained sensitive data from app developers, particularly in the area of

---

[61] Feathers et al., *supra* note 1.

[62] *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others,* FTC (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.

health-related information, contrary to its own policies."[63] "The information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective at enforcing Facebook's policy or preventing the receipt of sensitive data."[64] "Merely stating a rule, however, has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether app developers are violating this rule and takes no real action against developers that do."[65]

126.   The Markup and Reveal's own investigation also revealed that the Meta Pixel shares with Meta data, from webpages with sensitive health information, including the URLs with the most obvious sexual health information—"post-abortion," "i-think-im-pregnant," and "abortion-pill."[66]

127.   Despite knowing that the Meta Pixel was sharing sensitive health information with Meta when enabled on apps and websites that provide health-related services—and knowing that Meta's "polices" are woefully insufficient to screen medical information from being collected—Sharp still enabled the Meta Pixel on its appointment scheduling page and shared its patients' sensitive health information with Meta well through 2022.

**I.   Plaintiffs and Class Members Suffered Harm as a Result of the Illicit Disclosure of Their Sensitive Health Information.**

128.   The FTC has identified data collected about a person's precise location and information about their health as the most sensitive categories of data collected. Standing alone, these data points "pose an incalculable risk to personal privacy" but when technology companies collect the data, combine it, and sell or monetize it, this amounts to an "unprecedented intrusion" and creates "a new frontier of potential harms to consumers."[67]

---

[63] New York Department of Financial Services, *Report on Investigation of Facebook Inc. Data Privacy Concerns* (Feb. 18, 2021), https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_202.10218.pdf, at 7.

[64] *Id.* at 7–8.

[65] *Id.* at 16.

[66] Oldham & Mehrotra, *supra* note 22.

[67] Cohen, *supra* note 32.

129.   For example, the FTC recently reached a settlement with Flo Health, alleging the company shares sensitive health information about women collected from its period and fertility tracking app with Google and Meta, despite promising to keep this information private. FTC warns that the misuse use of such health information, including reproductive health data, exposes consumers to significant harm because: (1) criminals can use the health data to facilitate phishing scams or commit identity theft; (2) stalkers or other criminals can use the data to inflict physical and emotional injury; and (3) the exposure of health information and medical conditions can subject people to discrimination, stigma, mental, anguish, and other serious harms.[68]

130.   As Chris Bowen, The Chief Privacy and Security Officer for ClearData, explained health information is so valuable because "[y]ou can build [an] entire human persona around a health record. You can create or seek medical treatment, abuse drugs, or get prescriptions."[69] Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, has noted how "Health information is a treasure trove for criminals" because it contains "seven to 10 personal identifying characteristics of an individual."[70] Similarly, Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies, has noted that "[M]edical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information."[71] Such information, containing extensive personal identifying characteristics, is also valuable to

---

[68] *Id.*

[69] Will Maddox, *Why Medical Data is 50 Times More Valuable Than a Credit Card*, DMagazine (Oct. 15, 2019), https://www.dmagazine.com/healthcare-business/2019/10/why-medical-data-is-50-times-more-valuable-than-a-credit-card/.

[70] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon

[71] https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web

predatory advertisers. This is part of the reason why healthcare data may be valued at up to $250 per record on the black market.[72]

131.   HHS has further recognized the value of individual's health information explaining that a HIPAA-regulated entity's impermissible disclosure of an individual's PHI through tracking technology, such as the Meta Pixel, "may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment."[73]

132.   However, data is not just valuable to criminals. It is common knowledge that there is an economic market for consumers' personal data, including the sensitive health information Sharp shared with Meta. Private, personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

133.   In particular, healthcare information has enormous value. Healthcare providers, such as Sharp "sit on treasure troves: a stockpile of patient health data stored as electronic medical records."[74] These "files show what people are sick with, how they were treated, and what happened next."[75] Taken together, they're hugely valuable resources for

---

[72] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data*, SecureLink (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[73] HHS Privacy Bulletin, *supra* note 57.

[74] Nicole Wetsman, *Hospitals are selling treasures troves of medical data – what could go wrong?*, The Verge (June 23, 2021), https://www.theverge.com/2021/6/23/22547397/medical-records-health-data-hospitals-research.

[75] *Id.*

medical discovery."[76] When healthcare providers de-identify the records, *i.e.*, remove identifying information such as names, locations, and phone numbers, healthcare providers can sell the data to partners for research.

134.   Unsurprisingly, healthcare groups have taken advantage of de-identifying medical records. The Mayo Clinic in Rochester, Minnesota is working with a startup to develop algorithms to diagnose and manage conditions based on health data.[77] Fourteen U.S. healthcare systems formed a company to aggregate and sell de-identified data.[78] And one hospital chain even researched an agreement with Google to use patient data to develop healthcare algorithms.[79]

135.   Given the monetary values of sensitive health information, Sharp deprived Plaintiffs and the Class members of the economic value of their sensitive health information by sharing such data without providing proper consideration for Plaintiffs' and Class members' property.

## TOLLING

136.   Sharp seamlessly incorporated Meta Pixel into its appointment scheduling page, providing no indication to users that they were interacting with a website with the Meta Pixel enabled.

137.   Sharp had exclusive knowledge that its website an appointment scheduling page incorporated the Meta Pixel yet failed to disclose that by interacting with the Meta Pixel-enabled websites that Plaintiffs' and Class members' sensitive health information would be collected, used, and stored by Meta.

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] Nicole Westman, *Google to use patient data to develop healthcare algorithms for hospital chain*, The Verge (May 26, 2021), https://www.theverge.com/2021/5/26/22454817/google-hca-patient-data-health care-algorithms.

138.   Plaintiffs and Class members could not with due diligence have discovered the full scope of Sharp's conduct, including because there were no disclosures or other indication that they were interacting with Meta-Pixel enabled websites.

139.   The earliest Plaintiffs and Class members, acting with due diligence, could have reasonably discovered this conduct would have been on June 16, 2022, following the release of The Markup's investigation.

## CLASS ACTION ALLEGATIONS

140.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals ("Class") defined as follows:

> All natural persons in California who, within the applicable statute of limitations, visited Sharp's website and/or subpages and had their sensitive health information collected through Meta Pixel.

141.   Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

142.   **Numerosity**: The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed Class contains thousands of individuals who used Sharp's appointment scheduling page and had their sensitive health information shared by Sharp with Meta through the Meta Pixel. The exact number of members of the Class is unknown and the members can be identified through Sharp's and/or Meta's records.

143.   **Commonality**: The Class's claims present common questions of law and fact.. Common questions for the Class include, but are not limited to, the following:

a.       Whether Plaintiffs and Class members had a reasonable expectation of privacy in their sensitive health information communicated to Sharp;

b. Whether Meta Pixel is designed to send individually identifiable information from Sharp to Meta;

c. Whether Sharp violated Plaintiffs' and Class members' privacy rights;

d. Whether Sharp's transmittal to Meta of the contents of electronic communications between patients and Sharp occurred contemporaneous to their making;

e. Whether Sharp intercepted and/or transmitted to Meta the contents of electronic communications between patients and Sharp without Plaintiffs' and Class members' consent;

f. Whether Sharp's actions violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

g. Whether Sharp's actions violated the California Confidentiality of Medical Information Act, Civil Code §§ 56.06, 56.101, and 56.10;

h. Whether Plaintiffs and the Class members are entitled to equitable relief; and

i. Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

144. **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Class. The claims of Plaintiffs and the members of the Class arise from the same conduct by Defendant and are based on the same legal theories.

145. **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent, and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

146.   **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class.

147.   **Superiority**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

148.   Unless a class is certified, the Class will not be fully compensated from Defendant's wrongful conduct and statutory violation(s) and Defendant will undoubtedly continue to engage in the illegal conduct.

149.   Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### COUNT I
### Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion
### (Plaintiffs On Behalf of the Class)

150.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

151.   Plaintiffs bring this claim individually and on behalf of the Class.

152.   California common law recognizes a cause of action for intrusion upon seclusion.

153.   Plaintiffs and Class members had a reasonable expectation of privacy in their sensitive health information. Plaintiffs and Class members did not consent to, authorize, or

know about Sharp's intrusion at the time it occurred. Plaintiffs and Class members never agreed that Sharp could disclose their sensitive health information to third parties, including Meta. Plaintiffs intended their sensitive health information to stay private from third parties without their consent and Sharp represented that their sensitive health information would stay private and confidential.

154.   Plaintiffs and Class members had an interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

155.   Sharp intentionally intruded upon Plaintiffs' and Class members' private life, seclusion, or solitude, without consent.

156.   Sharp's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy because Plaintiffs' and Class Members' sensitive health information is private and was intended to remain private and confidential.

157.   Plaintiffs and Class members were harmed by Sharp's wrongful conduct as Sharp's conduct has caused Plaintiffs and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their sensitive health information.

158.   As a direct and proximate result of Sharp's conduct, Plaintiffs and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT II**
**Invasion of Privacy**
**California Constitution, Art. I § 1**
**(Plaintiffs on Behalf of the Class)**

159.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

160.   Plaintiffs bring this claim individually and on behalf of the Class.

161.   Article I, Section 1 of the California Constitution states "All people are by nature free and independent and have inalienable rights. Among these are enjoying and

defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

162.   Plaintiffs and members of the Class had, and continue to have, a legally protected interest in their sensitive medical and personal information that they provided to Sharp, deriving from common law and state and federal statutes, including, *inter alia*, HIPAA, The California Invasion of Privacy Act, and The Confidentiality of Medical Information Act.

163.   Plaintiffs and members of the Class had a reasonable expectation of privacy in their sensitive medical information and personal data shared with Sharp, because Plaintiffs and members of the Class did not consent to Sharp sharing such information, with Meta.

164.   Sharp, against its own Privacy Policy, intentionally collected and shared Plaintiffs' and Class members' sensitive medical and personal information without their consent.

165.   Sharp's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy because Plaintiffs' and Class Member's sensitive health information is private and was intended to remain private and confidential.

166.   Plaintiffs and Class members were harmed by Sharp's wrongful conduct as Sharp's conduct has caused Plaintiffs and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their sensitive health information.

167.   As a direct and proximate result of Sharp's conduct, Plaintiffs and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

### COUNT III
### Violation of California Confidentiality of Medical Information Act ("CMIA")
### Cal. Civil Code § 56, *et seq.*
### (Plaintiffs on Behalf of the Class)

168.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

---

169. Plaintiffs bring this claim individually and on behalf of the Class.

170. Sharp, a corporation organized in California, obtains and maintains confidential medical and personal information collected from Plaintiffs and members of the Class.

171. Section 56.10 of the CMIA prohibits entities subject to the CMIA, such as Sharp, from disclosing and negligently releasing the confidential medical information of their patients without authorization. Plaintiffs and members of the Class did not authorize the public disclosure or release of their confidential medical information.

172. Similarly, Sharp lawfully came into possession of Plaintiffs' and Class members' medical information and had a duty pursuant to Sections 56.06 and 56.101 of the CMIA to maintain, store and dispose of Plaintiffs' and Class members' medical records in a manner that preserved its confidentiality. Sections 56.06 and 56.101 of the CMIA prohibit the disclosure of confidential medical information.

173. As a direct result of Sharp's sharing of Plaintiffs' and Class members' confidential medical information without authorization as set forth above, Sharp violated Section 56, *et seq.*

174. As set forth above, third parties view, process, and analyze the confidential medical information they receive via the Pixel and the transmission of Plaintiffs' and Class Members' communications to those third parties, who then use the viewed confidential information to create profiles (such as Facebook's Custom and Lookalike Audiences) for advertising and marketing purposes. On information and belief, Meta could not create Custom and Lookalike Audiences without first viewing and analyzing Plaintiffs' and Class Members' confidential information.

175. Plaintiffs and Class members have been injured as a direct and proximate result of Sharp's violation of the CMIA, and are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages in an amount to be determined at trial; (3) statutory damages according to § 56.36; and (4) whatever other legal or equitable remedies that this Court deems appropriate.

**COUNT IV**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code §§ 630, *et seq.***
**(Plaintiffs on Behalf of the Class)**

176.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

177.   Plaintiffs bring this claim individually and on behalf of the Class.

178.   To establish liability under Section 631(a) of the CIPA, a Plaintiffs must establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner" either (1) "[i]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;" (2) "[w]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;" (3) "[u]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained;" or (4) "[a]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

179.   Section 631(a) applies to internet communications and thus applies to Plaintiffs' and the Class's sensitive health information which was shared by Sharp through the Meta Pixel. *See Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) (citing Cal. Penal Code § 631(a) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

180.   Sharp's use of the Meta Pixel is a "machine, instrument, contrivance, or . . . other manner" used to engaged in the prohibited conduct at issue here.

181.   Sharp procured Meta to automatically and secretly spy on, and intercept its patients' sensitive health information communicated through Sharp's appointment scheduling page in real time.

182.   To facilitate this wiretap, Sharp installed the Meta Pixel on its website and its appointment scheduling page.

183.   By installing the Meta Pixel on its website and appointment scheduling page, Sharp (1) intentionally caused Plaintiffs' and Class members' sensitive health and personal information to be intercepted, recorded, stored, and transmitted to Meta and (2) intentionally caused the contents Plaintiffs' and Class members' sensitive health and personal information to be accessed by Meta.

184.   Interception of Plaintiffs' and Class members' private and confidential electronic communications without their consent occurs whenever users engage with the Sharp appointment scheduling page.

185.   Plaintiffs and the Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted, especially where Sharp is a HIPAA covered entity to whom patients entrust their sensitive health information in order to receive medical care from Sharp.

186.   Sharp had no right to intercept, collect, and disclose the Plaintiffs' and the Class members' sensitive health information. Neither Plaintiffs nor the Class consented to Sharp's interception, disclosure, and/or use of their sensitive health information in their electronic communications with the Sharp appointment scheduling page. Nor could they. Sharp never sought to or did obtain Plaintiffs' or the Class members' consent.

187.   Sharp's conduct has needlessly harmed Plaintiffs and the Class by disclosing intimately personal facts and data in the form of their sensitive health information. This disclosure and loss of privacy and confidentiality has caused the Plaintiffs and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

188.   Plaintiffs and Class members seek all relief available relief under Cal. Penal Code § 631, including statutory damages of $2,500 per violation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class respectfully request that the Court enter an order:

A.     Certifying the Class and appointing Plaintiffs as the Class representatives;

B.     Appoint the law firms Lynch Carpenter, LLP; Ahdoot & Wolfson, PC; and Milberg Coleman Bryson Phillips Grossman, PLLC as class counsel;

C.     Finding that Defendant's conduct was unlawful, as alleged herein;

D.     Awarding declaratory relief against Defendant;

E.     Awarding such injunctive and other equitable relief as the Court deems just and proper;

F.     Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.     Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

H.     Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

I.     Granting such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, demands a trial by jury of any and all issues in this action so triable of right.


Dated: August 2, 2023                    **LYNCH CARPENTER LLP**

By:  */s/Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
1350 Columbia St., Ste. 603
San Diego, CA 92101
Tel.:  619-762-1900
Fax:  619-756-6991

---

PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Nicholas A. Colella
nickc@lcllp.com
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel.:   412-322-9243

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Christopher E. Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Deborah De Villa (SBN 312564)
ddevilla@wolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Tel.:   310-474-9111
Fax:   310-474-8585
John J. Nelson (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel:   858-209-6941

Jason S. Hartley (SBN 192514)
hartley@hartleyllp.com
Jason M. Lindner (SBN 211451)
lindner@hartleyllp.com
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
Tel:   619-400-5822

*Counsel for Plaintiffs and the Putative
Class*