TODD D. CARPENTER (SBN 234464)
todd@lcllp.com
**LYNCH CARPENTER LLP**
1350 Columbia Street, Suite 603
San Diego, CA 92101
Tel: 619-762-1910

ALEXANDER E. WOLF (SBN 299775)
awolf@milberg.com
JOHN J. NELSON (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872-365-7060

TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
CHRISTOPHER STINER (SBN 276033)
cstiner@ahdootwolfson.com
DEBORAH DE VILLA (SBN 312564)
**AHDOOT & WOLFSON, PC**
ddevilla@ahdootwolfson.com
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

JASON HARTLEY (SBN 192514)
hartley@hartleyllp.com
**HARTLEY LLP**
101 W. Broadway, Suite 820
San Diego, CA 92101
Tel: 619-400-5822

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANNAH COUSIN, LINDA CAMUS, and EDWARD BARBAT, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>SHARP HEALTHCARE,<br><br>        Defendant. | Case No. 3:22-cv-02040-MMA-DDL<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>***PARTIALLY REDACTED VERSION***<br><br>Date:       October 23, 2023<br>Time:      2:30 p.m.<br>Location:  Ctrm 3C<br>Judge:    Hon. Michael M. Anello<br>FAC Filed:  8/2/2023 |

1

## <u>TABLE OF CONTENTS</u>

2
I.      INTRODUCTION ....................................................................................1

3
II.     FACTUAL BACKGROUND....................................................................3

4
        A.      The Meta Pixel ....................................................................3

5
        B.      HIPAA Covered Entities Are Not Permitted to Implement
6               the Meta Pixel in a Way that Would Result in Impermissible
7               Disclosures of Protected Health Information......................3

8
        C.      Sharp's Use of the Meta Pixel............................................4

9
III.    LEGAL STANDARD ..............................................................................6

10
IV.     ARGUMENT............................................................................................7

11
        A.      Plaintiffs State a Claim for Violation of CIPA ..................7
12
                1.      The Standard For "Content" Under CIPA .................8
13
14              2.      Plaintiffs Adequately Allege Content Information
                        Was Intercepted..........................................................9
15
16      B.      Plaintiffs State a Claim for Violation of CMIA ...............13
17
                1.      Plaintiffs Plausibly Allege Medical Information
18                      Was Disclosed...........................................................13
19              2.      Plaintiffs Plausibly Allege Meta Viewed
20                      Medical Information ..................................................16
21      C.      Plaintiffs State a Plausible Claim for Intrusion Upon Seclusion .......18

22
V.      CONCLUSION.......................................................................................23

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Barbour v. John Muir Health*,
    2023 WL 2618967 (Cal. Super. Jan. 05, 2023) ........................................................ 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................... 6

*Belozerov v. Gannett Co.*,
    No. CV 22-10838-NMG, 2022 WL 17832185 (D. Mass. Dec. 20, 2022) ................ 16

*Brown v. Google LLC*,
    No. 4:20-CV-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) .............. 8, 10

*Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*,
    132 Cal. App. 4th 1466 (2005) ................................................................................. 14

*Doe v. Beard*,
    63 F. Supp. 3d 1159 (C.D. Cal. 2014) ...................................................................... 20

*Doe v. Bon Secours Mercy Health*,
    2021 WL 9939010 (Ohio Com. Pl. Nov. 22, 2021) .................................................. 12

*Doe v. Boone Health, Inc.*,
    2023 WL 4996117 (Mo. Cir. July 20, 2023) ............................................................ 12

*Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-WHO,
    2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) ............................................. 7, 9, 10, 12

*Doe v. Regents of Univ. of California*,
    2023 WL 3316766 (N.D. Cal. May 8, 2023) ....................................................... 12, 20

*Eisenhower Med. Ctr. v. Sup. Ct.*,
    226 Cal. App. 4th 430 (2014) ................................................................................... 14

*Hernandez v. Hillsides, Inc.*,
    47 Cal. 4th 272 (2009) .............................................................................................. 19

*Hill v. Nat'l Collegiate Athletic Assn.*,
    7 Cal. 4th 1 (1994) .................................................................................................... 20

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ............................................................................. passim

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
   806 F.3d 125 (3d Cir. 2015).................................................................................... 8

*In re Google, Inc. Privacy Policy Litig.*,
   58 F. Supp. 3d 968 (N.D. Cal. 2014) ................................................................... 22

*In re Google RTB Consumer Priv. Litig.*,
   606 F. Supp. 3d 935 (N.D. Cal. 2022) ........................................................... passim

*In re Hulu Priv. Litig.*,
   No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)........................ 16

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................ 22

*In re Meta Pixel Healthcare Litig.*,
   No. 22-CV-03580-WHO, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) ........ passim

*In re Pharmatrak, Inc.*,
   329 F.3d 9 (1st Cir. 2003) ...................................................................................... 12

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
   613 F. Supp. 3d 1284 (S.D. Cal. 2020)............................................................ 16, 20

*In re Zynga Priv. Litig.*,
   750 F.3d 1098 (9th Cir. 2014) ............................................................................ 8, 13

*Javier v. Assurance IQ, LLC*,
   2022 WL 1744107 (9th Cir. May 31, 2022) ........................................................... 12

*Katz-Lacabe v. Oracle America, Inc.*,
   No. 22-cv-04792-RS, 2023 WL 2838118 (N.D. Cal. Apr. 6, 2023) .................. 10, 20

*Kurowski v. Rush System for Health*,
   2023 WL 2349606 (N.D. Ill. Mar. 2, 2023).......................................................... 23

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ................................................................................. 7

*Low v. LinkedIn Corp.*,
   900 F. Supp. 2d 1010 (N.D. Cal. 2012)................................................................. 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)............................................................................................... 13

iii

*Pioneer Electronics, Inc. v. Sup. Ct. of L.A.*,
   40 Cal. 4th 360 (2007) ................................................................ 19, 21

*Pruitt v. Par-A-Dice Hotel Casino*,
   2020 WL 5118035 (C.D. Ill. Aug. 31, 2020)....................................... 17, 18

*Purvis v. Aveanna Healthcare, LLC*,
   563 F. Supp. 3d 1360 (N.D. Ga. 2021) ................................................. 21

*Revitch v. New Moosejaw, LLC*,
   No. 18-CV-06827-VC, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ..................... 11

*Ruiz v. Podolsky*,
   50 Cal. 4th 838 (2010) ................................................................ 20

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*,
   786 F.3d 510 (7th Cir. 2015) ........................................................... 17

*Saleh v. Nike, Inc.*,
   562 F. Supp. 3d 503 (C.D. Cal. 2021) .............................................. 8, 11

*Smith v. Facebook, Inc.*,
   262 F. Supp. 3d 943 (N.D. Cal. 2017) .............................................. 14, 16

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ........................................................... 18

*Stake v. Knox Community Hosp.*,
   2023 WL 5719594 (Ohio Com. Pl. Aug. 24, 2023) ..................................... 12

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ......................................................... 17

*Stasi v. Inmediata Health Grp. Corp.*,
   501 F. Supp. 3d 898 (S.D. Cal. 2020)................................................... 16

*Tamraz v. Bakotic Pathology Assocs., LLC*,
   No. 22-cv-0725-BAS-WVG, 2022 WL 16985001 (S.D. Cal. Nov. 16, 2022) .......... 16

**<u>Statutes</u>**

Article I, Section 1 of the California Constitution............................................ 22

Cal. Civ. Code § 56.05(i) ............................................................... 13

iv

Cal. Civ. Code § 56.10(a) ................................................................................. 13

Cal. Pen. Code § 631(a) ..................................................................................... 7

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 6

**<u>Regulations</u>**

78 Fed. Reg. 5566 (Jan. 25, 2013) ..................................................................... 2

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:22-CV-02040-MMA-DDL

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs Hannah Cousin, Linda Camus, and Edward Barbat ("Plaintiffs") filed a First Amended Consolidated Class Action Complaint (ECF No. 23) ("FAC") against Sharp Healthcare ("Sharp" or "Defendant") challenging its blatant disregard for its patients' information, including, *inter alia*, sensitive health information and details regarding medical conditions and treatments, doctor preferences, and scheduled doctors' appointments. Using Meta Pixel, a hidden tracking tool Sharp embedded on its website and patient scheduling page, Sharp intentionally enabled Meta Platforms, Inc. ("Meta" formerly, Facebook) to surreptitiously intercept Plaintiffs' and other patients' electronic communications, including sensitive health information, with their healthcare provider, Sharp.

On July 12, 2023, the Court dismissed Plaintiffs' Consolidated Class Action Complaint (ECF No. 14) without prejudice, finding that Plaintiffs had not adequately alleged what information they provided to Sharp via its website. ECF No. 20, pp. 5–7. The Court also questioned whether Sharp's sharing of what the Court characterized as Plaintiffs' and class members' website browsing activity constituted a disclosure of their sensitive medical information. *Id*. at p. 6. Plaintiffs filed their FAC on August 2, 2023, addressing the deficiencies identified by the Court. *See* ECF No. 23.

*First*, Plaintiffs bolster their claims with allegations that the Department of Health and Human Services ("HHS") has reaffirmed that healthcare providers' public facing websites addressing specific symptoms or health conditions or that permit individuals to search for doctors or schedule doctor's appointments *do* share protected health information ("PHI") under the Health Insurance Portability and Accountability Act ("HIPAA") when those webpages contain tracking technologies and also collect personally identifying information, such as an individual's email address or IP address

(as is the case here). *See* FAC ¶¶ 101–104.[1]  In any event, this information is "content" under the California Invasion of Privacy Act ("CIPA") because the Meta Pixel collects search terms and descriptive URLs that, in turn, disclose to Meta specific webpages relating to specific medical conditions viewed by patients visiting Sharp's website. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) (finding that categories of the website, categories that describe the current section of the website, and referrer URL that caused navigation to the current page constituted "content").

*Second*, Plaintiffs now allege the specific communications and interactions made with Sharp's website—including how they searched for and identified physicians for medical treatment, how they scheduled appointments with specific doctors, how they searched for information regarding their medical conditions or treatment, and the specific webpages they accessed and viewed. *See* FAC ¶¶ 70–89. Because the Meta Pixel was embedded on Sharp's website and relevant webpages when these communications occurred (*Id*. ¶¶ 41–68), Plaintiffs have thus alleged that their PHI was disclosed to Meta and cured the Court's identified deficiency.

*Third*, Plaintiffs' allegations provide additional details describing the steps they took to book a doctor's appointment on Sharp's website. *Id*. ¶¶ 70–89. Because Plaintiffs also generally allege what information is disclosed to Meta via the Meta Pixel when a patient books an appointment via Sharp's website (*Id*. ¶¶ 56–60), Plaintiffs' allegations sufficiently address the Court's deficiency concerns.

Because Plaintiffs' FAC cures each of the deficiencies identified by the Court in its prior Order (ECF No. 20) ("Order"), Plaintiffs respectfully request that the Court deny

---

[1] *See also* 78 Fed. Reg. 5566, 5598 (Jan. 25, 2013) (If information received from a patient "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received healthcare services or benefits from the covered entity, and therefore it must be protected . . . in accordance with the HIPAA rules.").

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:22-CV-02040-MMA-DDL

Sharp's Motion to Dismiss in its entirety.

## II.  FACTUAL BACKGROUND

### A.  The Meta Pixel

The Meta Pixel was introduced in 2015 by Meta to refine targeted advertising. FAC ¶ 18. The Meta Pixel is an invisible tracking pixel that is seamlessly embedded on third-party websites and collects granular data for every interaction on a webpage in real time as those interactions occur. *Id*. ¶¶ 1–2, 21. This data can include information about a person's healthcare provider and service location; types of medical conditions and treatments researched; entries typed into forms; dates and times of doctor's appointments (along with the reasons for requesting an appointment); personally identifying information, such as the user's identity, Facebook ID (which allows Meta to identify the user's Facebook profile), or IP address; and other information entered by a website user. *Id*. ¶¶ 3, 4, 40-68. Through a process called Advanced Matching, Meta uses the information harvested by the Meta Pixel to connect that information to a specific person's Facebook and/or Instagram profile. *Id*. ¶ 27. Even if that person does not have a Facebook or Instagram account, Meta will create a "shadow profile" with each person's harvested data. *Id*. ¶ 28. Meta gathers a vast amount of information as more than six million websites currently use Meta Pixel. *Id*. ¶ 26.

### B.  HIPAA Covered Entities Are Not Permitted to Implement the Meta Pixel in a Way that Would Result in Impermissible Disclosures of Protected Health Information

On December 1, 2022, HHS issued a privacy bulletin ("Privacy Bulletin" or "HHS Bulletin")[2] to entities covered by HIPAA, reminding them that the HIPAA Privacy Rule

---

[2] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV. (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

3

applies to the use of tracking technologies, such as Meta Pixel. *Id*. ¶ 101. Specifically, HHS reminded covered entities that HIPAA's Privacy Rule applies to their implementation of tracking technologies on their websites and webpages that address specific symptoms and health conditions, and websites and webpages that permit individuals to search for doctors or schedule appointments. *Id*. HHS explained that HIPAA's Privacy Rule applies to such information when the embedded tracking technologies also collect identifying information such as individual's email address or IP address (or Facebook ID). *Id*. ¶ 102. Importantly, "[t]he HHS Privacy Bulletin noted that 'it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors,' [and] then explains how online tracking technologies violate the same HIPAA rules that have existed for decades." *Id*. ¶ 103.

On June 20, 2023, HHS again reminded "regulated entities that they 'are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules.'" *Id*. ¶ 104. "For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures." *Id*. ¶ 104. Importantly, if the tracking technology vendor is not a business associate of the regulated entity, "then the individuals' HIPAA-compliant authorizations are required *before* the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do *not* constitute a valid HIPAA authorization."[3]

### C.   Sharp's Use of the Meta Pixel

Sharp is San Diego's leading healthcare provider, operating its flagship location—Sharp Memorial Hospital—and numerous other healthcare locations. *Id.* ¶ 13. Sharp operates the website and related subpages of www.sharp.com. *Id.* ¶ 41. Sharp's website

---

[3] Privacy Bulletin, *supra* note 2.

enables patients to search for doctors and medical services Defendant makes available across San Diego County; search for provider locations; schedule doctor's appointments; and search for webpages that address specific symptoms, health conditions, and/or treatment. *Id.* ¶ 41. Despite being a trusted provider of healthcare services and a regulated entity under HIPAA, Sharp intentionally chose to embed the Meta Pixel on its website and webpages. *Id*. ¶¶ 6, 43.

As a result of Sharp's use of Meta Pixel, Plaintiffs' and class members' sensitive health and personal information was unlawfully and surreptitiously shared with Meta. Plaintiffs are all patients of Sharp; they previously used Sharp's website and related webpages; and received treatment at one of Sharp's locations. *Id.* ¶ 69. For example, Plaintiff Camus used Sharp's website and webpages to find a physician and schedule an appointment for her specific and private medical condition. *Id.* ¶¶ 76–81. When Plaintiff Camus scheduled a doctor's appointment, she communicated with Sharp's website by selecting, among other things, the physician she chose to book an appointment with, a time for her visit, the appointment type, her date of birth, and the reason for her visit. *Id.* ¶ 81. These confidential communications were intercepted by the Meta Pixel and shared with Meta. *Id.* ¶ 83. Plaintiff Barbat also used Sharp's website and related webpages to search for information related to his specific and private medical condition. *Id.* ¶ 85. Specifically, Plaintiff Barbat communicated with Sharp's website when he utilized the website's search bar to enter a unique search for information related to his medical condition. *Id.* ¶ 86. Finally, Plaintiff Cousin utilized the "Find a Doctor" function on Sharp's website (as well as information provided on other related webpages) to find her primary care physician. *Id.* ¶ 71. Sharp's "Find a Doctor" function encouraged and allowed Plaintiff Cousin to further search for doctors by filtering the physician directory and clicking on the profiles of various Sharp physicians, which then directed her to the physicians' specific webpages. *Id.* ¶¶ 71–72. These confidential communications intended only for Sharp were intercepted by the Meta Pixel and shared with Meta. *Id.* ¶ 74. These confidential communications were also intercepted by the Meta Pixel and

5

shared with Meta. *Id.* ¶ 88. Using Plaintiffs' unique Facebook ID (c_user ID) generated by the Meta Pixel, Meta is able to then correlate and combine the information intercepted from Sharp's website and webpages with the information obtained across all other webpages visited by Plaintiffs and link it to their Facebook and/or Instagram accounts or otherwise create "shadow profile[s]." *Id.* ¶¶ 4, 28.

Importantly, Sharp's secret disclosure (and Meta's surreptitious harvesting) of patients' sensitive medical information is done without patients' consent. *Id.* ¶¶ 3, 4, 6, 49, 74, 83, 88. As a HIPAA-covered entity, Sharp can only share patients' medical information with third parties if it obtains express consent from patients or it enters into a HIPAA-approved contract with Meta. *Id.* ¶¶ 100, 105. Sharp did neither. *Id.* ¶ 105. Instead, Sharp intentionally embedded the Meta Pixel on its website—including its appointment scheduling page—while knowing that Meta was harvesting the sensitive medical information of Sharp's patients. As alleged in the FAC, Sharp's procurement and embedding of the Meta Pixel on its website and webpages is unlawful, violates HIPAA, and is highly offensive to a reasonable person. Sharp is required to, and does, have a Notice of Privacy Practices that informs patients that it is "responsible for safeguarding [patients'] protected health information" and that "information about [patients] and [patients'] health is confidential." *Id.* ¶ 5. Relying on those privacy practices, Plaintiffs provided their sensitive health information to Sharp to seek and/or obtain medical treatment, attention, or consultations. In a highly offensive invasion of its patients' privacy, Sharp facilitated and allowed the impermissible disclosure of their personal health information to Meta without patients' knowledge or prior consent.

## III.   LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim. *Id.* A dismissal under Rule 12 is improper where the complaint pleads "enough facts to state a claim [for] relief that is plausible on its face." *In re Google RTB*, 606 F. Supp. 3d at 942 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In deciding whether the plaintiff has stated a claim upon which relief can be

granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff." *Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-WHO, 2023 WL 5837443, at *2 (N.D. Cal. Sept. 7, 2023). "If the court dismisses the complaint, it 'should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Id.* (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

## IV.   ARGUMENT

### A.   Plaintiffs State a Claim for Violation of CIPA

Section 631(a) of CIPA prohibits any person from using electronic means to "learn the contents or meaning" of any "communication" "without consent" or in an "unauthorized manner." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) ("*Facebook Tracking*") (quoting Cal. Pen. Code § 631(a)). A claim lies not only against the interceptor, but also against a person "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit" the interception. Cal. Pen. Code § 631(a). The Court previously rejected Sharp's arguments that, as a matter of law, Sharp did not aid, employ, or conspire with another who violated CIPA (*i.e.*, Meta), and that no interception "in transit" was plausibly alleged. ECF No. 20, pp.16–17. The Court, however, dismissed the CIPA claim with leave to amend, finding that Plaintiffs must allege additional facts regarding their own experiences with intercepted content. *Id.*

Heeding the Court's instruction, Plaintiffs did just that. The FAC alleges in greater detail the actions that Plaintiffs took on Sharp's website, the types of information they provided to Sharp, and their individual medical conditions (about which Plaintiffs communicated with Sharp)—in addition to the technical operation of Meta Pixel. FAC ¶¶ 69–91. As alleged, the Meta Pixel intercepts the substantive content of private patient communications with Sharp, including search queries, health conditions, treatment sought, and doctor's appointment requests and bookings. *Id.* ¶¶ 41–68, 128–35. Sharp only challenges the "contents" element, and in doing so, ignores the allegations of the

7

1    FAC and misapplies the law. Mot. at 23-24.

2        **1.    The Standard For "Content" Under CIPA**

3        Under CIPA,[4] the term "'contents' refers to the intended message conveyed by the

4    communication and does not include record information regarding the characteristics of

5    the message that is generated during the communication." *In re Zynga Priv. Litig.*, 750

6    F.3d 1098, 1106 (9th Cir. 2014). Record information and content, however, "are not

7    mutually exclusive categories." *In re Google Inc. Cookie Placement Consumer Priv.*

8    *Litig.*, 806 F.3d 125, 139 (3d Cir. 2015). Information that would otherwise be considered

9    "record information"—such as "names, addresses, telephone numbers, and email

10   addresses"—are "contents" of a communication "where the user communicates with a

11   website by *entering his information into a form* provided by the website." *Saleh v. Nike,*

12   *Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021) (emphasis added). "For instance, contact

13   information provided as part of a sign-up process constitutes 'content' because this

14   information is the subject of the communication." *In re Meta Pixel Healthcare Litig.*,

15   2022 WL 17869218, at *11.

16       The "post-domain name portions" of website URLs—*i.e.*, everything after

17   ".com"—also constitute "contents" where it includes information entered by the user. *See*

18   *In re Google Inc. Cookie Placement*, 806 F.3d at 139 ("post-domain name portions of the

19   URL are designed to communicate to the visited website which webpage content to send

20   the user."); *Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *15

21   (N.D. Cal. Aug. 7, 2023) (URLs constitute "contents" under CIPA because "Google

22   collects the type of search queries the Ninth Circuit thought could be content in *Zynga*

23   *Privacy*."); *In re Google RTB*, 606 F. Supp. 3d at 948–49 (finding that categories of the

24   website, categories that describe the current section of the website, and referrer URL that

25

26   _____

27   [4] "The analysis for a violation of CIPA is the same as that under the federal Wiretap Act."
     *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *14

28   (N.D. Cal. Dec. 22, 2022).

caused navigation to the current page constituted "content").

*In re Meta Pixel Healthcare Litig.* is illustrative. There, four Facebook users brought wiretapping claims against Meta, alleging their healthcare providers installed the Meta Pixel on their websites and patient portals. 2022 WL 17869218, at *1. Meta asserted that "the names of buttons clicked on websites and their associated URLs are not 'content' within the meaning of the statute," *id.* at *11, but the court "disagree[d]," observing that "the transmitted URLs include both the 'path' and 'query string,'" and holding that "[t]hese items are content because they concern the substance of a communication." *Id.* The court specifically identified the following URL as constituting "content" under CIPA because it contains substantive information regarding treatment sought: *hardfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis. Id.* (emphasis added). The court further found that information regarding "log-in button" clicks were similarly descriptive in part because it "sufficiently identifies the website user as a patient." *Id.*, at *8, 11. *See also Doe*, 2023 WL 5837443, at *3–4 (same).

### 2. Plaintiffs Adequately Allege Content Information Was Intercepted

The FAC is replete with allegations that Sharp enabled Meta to intercept the contents of Plaintiffs' user-entered and user-specific communications.

Plaintiff Camus has been a Sharp patient for fifteen years. FAC ¶ 75. ██████ ████████████████████████████ *Id.* ¶¶ 76–77. ████████████████ ████████████████████████████████████████████████████████████████ *Id.* ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *Id.* ¶ 79– 80. ████████ which required her to complete an online form "selecting the physician, a time for her visit, the appointment type, her date of birth, and inputting the reason for her visit along with other information." *Id.* ¶ 81. Plaintiff Camus alleges that this information was

9

intercepted by Meta. *Id.* ¶¶ 82–83. The FAC explains how the Meta Pixel caused each of these communications to be intercepted by and disclosed to Meta. *See id.* ¶¶ 57–60, 67

Plaintiff Barbat has been a Sharp patient for over ten years. *Id.* ¶ 84. ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████ *Id.* ¶ 85. In doing so, he too communicated his sensitive health information with Sharp's website (*id.* ¶ 86), which was covertly intercepted by Meta. *Id.* ¶¶ 89–90.

Plaintiff Cousin has been a patient of Sharp since 2017 and used the Sharp website to find her primary care physician. *Id.* ¶¶ 70–71. She utilized the "Find a Doctor" tab on Sharp's website, filtered by specialty (primary care) and availability (accepting new patients), and clicked "View my results." *Id.* ¶ 72. She also clicked on the profiles of Sharp physicians. *Id.* This information was intercepted by Meta. *Id.* ¶¶ 73–74.

Plaintiffs' interactions with Sharp's website are not mere mouse clicks that convey no substance. If Plaintiff Barbat had called Sharp's "publicly available" telephone number and asked questions about doctors ████████████████████ there is no question the message conveyed would be considered "contents." Using Sharp's website is no different. As numerous courts have held, the search terms entered by Plaintiffs (which appear verbatim in the intercepted URLs) are "content" information. *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11; *Facebook Tracking*, 956 F.3d at 605 (Facebook intercepted the content of the plaintiffs' communications by "collect[ing] a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web-server, and the name of the precise file requested"); *Katz-Lacabe v. Oracle America, Inc.*, No. 22-cv-04792-RS, 2023 WL 2838118 at *15 (N.D. Cal. Apr. 6, 2023) ("referrer URLs" constitute content). Plaintiffs' use of the website to get information about specific conditions – which conditions and searches were then surreptitiously shared with Meta – is more like the "contents of a letter" than the "outside of an envelope." *Brown*, 2023 WL 5029899, at *15.

So too is the personal and medical information entered by Plaintiff Camus into

10

Sharp's appointment scheduling form (*e.g.*, date of birth and reason for her visit), and Plaintiff Cousin's selections on the "Find a Doctor" tab. *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11 ("contact information provided as part of a sign-up process constitutes 'content'"); *Saleh*, 562 F. Supp. 3d at 517 (finding names, addresses, telephone numbers, and email addresses entered into an online form are "contents").

Plaintiffs' allegations regarding the Meta Pixel's operation provide sufficient detail as to how such content was intercepted by Meta at Sharp's behest. Sharp installed the Meta Pixel on the pages of its website visited by Plaintiffs. FAC ¶¶ 41–43, 57–60, 67, 69–91. The Meta Pixel transmitted data—including the fact that a patient booked an appointment with a particular doctor, the identity of the patient's physician, the URL of the page requested, and the title of the page—to Meta. *Id*. The Meta Pixel also transmitted the patient's search terms (which are repeated in the URLs and contain the patient's treatment and/or diagnoses), the patient's unique and persistent Facebook ID, and the patient's location filter to Meta. *See Id.* ¶¶ 46, 50–68. Thus, content information, including a patient's identity, medical condition, doctor's appointments, and reasons for requesting an appointment, all were covertly shared with Meta via the Meta Pixel intentionally installed by Sharp on its website. *Id.* ¶¶ 2–4, 23, 41–91.

Sharp's argument to the contrary ignores these allegations and contravenes its own cited authorities. First, Sharp accuses Plaintiffs of blurring the "bright line" between public website "browsing information" and "patient records" or "patient-doctor communications," (Mot. at 14, 24), but this is no defense to a CIPA claim. CIPA protects *all* communications from unlawful interception—including communications with public websites. *See, e.g.*, *Saleh*, 562 F. Supp. 3d at 517–18 (adequately alleging contents intercepted on public Nike website); *Revitch v. New Moosejaw, LLC*, No. 18-CV-06827-VC, 2019 WL 5485330, at *1 (N.D. Cal. Oct. 23, 2019) (applying CIPA to communications between consumer and online retailer); *see also supra*, Section IV.A.1. Even so, Plaintiffs' allegations far exceed "browsing information" collected from a user's meandering of a public website. Courts in California and around the country have found

that patient communications with a hospital's website go beyond mere "browsing." *See, e.g.*, *Doe*, 2023 WL 5837443, at *3 (denying motion to dismiss CIPA and privacy claims where plaintiffs alleged that users entered their personal medical information into forms provided by hospital websites); *Doe v. Regents of Univ. of California*, 2023 WL 3316766, at *4 (N.D. Cal. May 8, 2023) (denying motion to dismiss where plaintiff alleged that hospital system "intentionally incorporated Meta Pixel on the UCSF website and password protected MyChart portal").[5] Here, Plaintiffs allege that their medical searches reflecting specific health conditions, pursuit of treatment for those conditions, and booking of appointments with specific doctors were improperly disclosed to Meta. FAC ¶¶ 41–91. The Court should construe these allegations as they are, not as Sharp wants them to be.

Second, citing *In re Zynga*, Sharp argues that URLs are not contents of a communication as a matter of law. Mot. at 24. Sharp is wrong. *In re Zynga* involved URLs that included "only basic identification and address information, *not a search term*

---

[5] *See also, e.g.*, *Cyr v. Orlando Health*, No. 8:23-cv-588, ECF No. 37 (M.D. Fl. July 5, 2023) (denying defendant's motion to dismiss in full, including claims under Florida's analogous wiretapping statute, where plaintiffs alleged hospital installed pixels on its website); *Doe v. Boone Health, Inc.*, 2023 WL 4996117, at *3 (Mo. Cir. July 20, 2023) (holding hospital violated patients' privacy rights by disclosing "health information to Facebook and Google [collected] via tracking tools on its website"); *Stake v. Knox Community Hosp.*, 2023 WL 5719594, at *3 (Ohio Com. Pl. Aug. 24, 2023) (same); *Barbour v. John Muir Health*, 2023 WL 2618967, at *9 (Cal. Super. Jan. 05, 2023) (same); *Doe v. Bon Secours Mercy Health*, 2021 WL 9939010, at *3 (Ohio Com. Pl. Nov. 22, 2021) (same); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) (plaintiff stated valid claim by alleging that he provided "demographic information and medical history" via forms filled out on insurance company website); *In re Google RTB*, 606 F. Supp. 3d at 948 (denying motion to dismiss where plaintiffs alleged that "health data such as whether someone suffers from depression or eating disorders" was disclosed without their consent); *In re Pharmatrak, Inc.*, 329 F.3d 9, 12 (1st Cir. 2003) (plaintiffs stated valid wiretapping claims where "pharmaceutical companies invited users to visit their websites to learn about their drugs and to obtain rebates").

or *similar communication made by the user*," and therefore were not considered contents of a communication. 750 F.3d at 1109 (emphasis added). *In re Zynga* itself acknowledges that "[u]nder some circumstances, a user's request to a search engine for specific information could constitute a communication such that divulging a URL containing that search term to a third party could amount to disclosure of the contents of a communication." *Id.* at 1108–09. Again, URLs "disclosing a search term or similar communication made by the user" "are content because they concern the substance of a communication." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11 (distinguishing *In re Zynga*). The FAC contains allegations that such content was intercepted by the Meta Pixel. FAC ¶¶ 57–60, 67.

Third, the FAC is not devoid of "factual support" or "bareboned." Mot. at 24. At the "pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted). Nothing more is required.

Accordingly, Plaintiffs have properly alleged the Meta Pixel intercepted the contents of their communications with Sharp's website.

## B. Plaintiffs State a Claim for Violation of CMIA

### 1. Plaintiffs Plausibly Allege Medical Information Was Disclosed

The CMIA states that a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . . ." Cal. Civ. Code § 56.10(a). "'Medical information' means *any* individually identifiable information, in electronic or physical form . . . regarding a patient's *medical history*, mental health application information, *mental or physical condition, or treatment*." Cal. Civ. Code § 56.05(i) (emphasis added). In turn, "'individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual." *Id.* California courts have interpreted this statutory language to require

13

disclosure of individually identifiable information that has a "substantive" medical treatment nexus. *See, e.g.*, *Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*, 132 Cal. App. 4th 1466, 1472 (2005) (distinguishing between disclosing that a person is a patient of a particular healthcare facility and disclosing the nature of the patient's treatment); *c.f. Eisenhower Med. Ctr. v. Sup. Ct.* 226 Cal. App. 4th 430, 434–36 (2014) (explaining that the compromised information amounted only to "individually identifiable information" because it did not show specific medical concerns or treatments). Thus, while the mere fact that a person was a patient at a particular facility may not communicate protected medical information under CMIA (as opposed to HIPAA), communications that reveal the *nature* of a patient's medical treatment do.

Citing *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 947 (N.D. Cal. 2017), Sharp insists that the only information shared was "available on publicly accessible websites" and is therefore not medical information covered by the CMIA. Mot. at 19. However, *Smith* is readily distinguishable. As Sharp notes, *Smith* involved cancer.net, a general information website that was *not* associated with or operated by a hospital. *Smith*, 262 F. Supp. 3d at 347. The entity managing cancer.net could not see patients, could not provide "treatment," and had no online appointment booking tool. *Id.* Accordingly, in *Smith*, "[n]othing about the URLs, or the content of the pages located at those URLs, relate[d] 'to the past, present, or future physical or mental health or condition *of an individual*.'" *Id.* at 954 (emphasis in original).

Unlike *Smith*, the information at issue here is far broader and more intrusive than the fact that a person visited Sharp's website and browsed its webpages. The information implicated here contains—and, thus, reveals—an individual Sharp patient's health concerns, treatments, or conditions. *See* FAC ¶¶ 41–43, 69–91. ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *id.* ¶¶ 76–83, is not information "available on publicly accessible websites." ████████████████ ████████████████████████████████████████████████████████████████

████████████████ *id.* ¶¶ 85–88, is also not information "available on publicly accessible websites." Nor is the fact that Cousin searched for a primary care physician at Sharp based on her specific desires for the physician's philosophy of patient care. *Id.* ¶¶ 71–72. Instead, this sensitive information was sent alongside Facebook IDs and IP addresses, which Meta used to associate the confidential medical information to corresponding Facebook profiles, to unlawfully identify specific patients who had or were seeking treatment from Defendant. *Id.* ¶¶ 4, 23, 30, 50–68.

Ignoring that Sharp illegally disclosed patients' PHI on its website, Sharp focuses on whether Plaintiffs alleged that the MyChart patient poral also contains tracking technology. Mot. at 19–20. In doing so, Sharp manufactures a false distinction where information on the MyChart portal is protected under law, but information transmitted by patients on Sharp's website is not. This argument flies in the face of HIPAA's Privacy Rule, which as a covered entity, Sharp must follow.

Critically, HHS has affirmed that HIPAA's protections apply outside a secure patient portal—including on "unauthenticated webpages, which are webpages that do *not* require users to log in before they are able to access the webpage, *such as a webpage with general information* about the regulated entity like their location, services they provide, or their policies and procedures."[6] "Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances."[7] And contrary to Defendant's argument, Plaintiffs explicitly allege that "Sharp's website and related subpages are considered 'unauthenticated webpages' because they do not require patients to log in before they can access the website and related subpages. FAC ¶ 42.

---

[6] Privacy Bulletin, *supra* note 2 (emphasis added).
[7] *Id.*

1    Thus, Sharp disclosed medical information related to conditions and treatment,
2    which were individually identifiable because the information was linked to Plaintiffs'
3    Facebook IDs (or "shadow profiles").[8] The disclosure of this data is sufficient to meet the
4    requirement of "substantive" medical information. *Tamraz v. Bakotic Pathology Assocs.,*
5    *LLC*, No. 22-cv-0725-BAS-WVG, 2022 WL 16985001, at *5 (S.D. Cal. Nov. 16, 2022)
6    ("Drawing reasonable inferences in favor of the non-moving party, the Court finds that
7    'specimen or test information' is 'medical information' under the CMIA. Therefore,
8    Plaintiff adequately alleges the data breach included 'medical information' under the
9    CMIA.").[9]

### 2.    Plaintiffs Plausibly Allege Meta Viewed Medical Information

11    At the pleading stage, Plaintiffs need only allege facts that "give rise to the
12    inference that their medical information has been viewed by an unauthorized third party."
13    *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d
14    1284, 1299 (S.D. Cal. 2020) (allegations that plaintiffs received an increase in spam
15    emails and phone calls were sufficient to infer that their medical information was viewed
16    as a result of a data breach); *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898,
17    923 (S.D. Cal. 2020) (finding that for information "posted . . . on the internet . . . it can
18    be reasonably inferred that someone viewed it."). The Court previously dismissed
19    Plaintiffs' CMIA claim because supporting facts regarding Meta's business model were
20    not expressly alleged, and as a result, Meta's viewing of medical information could not
21    be inferred. ECF No. 20, p. 15. Such supporting facts are pleaded in the FAC and

---

[8] "A Facebook ID is a unique identifier that allows anyone to discover the user's identity. Furthermore, courts in other circuits have explicitly held that a Facebook ID constitutes PII." *Belozerov v. Gannett Co.*, No. CV 22-10838-NMG, 2022 WL 17832185, at *4 (D. Mass. Dec. 20, 2022); *accord In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID . . . personally identifies a Facebook user.").

[9] *See also*, *supra* note 5.

1    Plaintiffs should be allowed the benefit of further fact discovery to prove them.

2            Meta is a company that derives its revenue from selling advertising space based

3    on its ability to target consumers with precision accuracy. Consistent with this objective,

4    Meta "touts the 'retargeting ability of the Meta Pixel,' describing how it can help

5    advertisers create 'Custom Audiences,' tailoring advertisements to 'people who have

6    engaged with the page your pixel is on.'" FAC ¶ 24. Meta further "describes how the

7    information harvested by the Meta Pixel can build 'Lookalike Audiences," analyzing the

8    information and generating a similar group for targeting." *Id.* To execute this, Meta

9    "needs to receive and analyze" user-specific and granular data "gathered by the Meta

10   Pixel." *Id.* ¶¶ 23–24. As applied here, once Plaintiffs' and Class Members' "sensitive

11   health information is intercepted and collected by the Meta Pixel, Meta processes this

12   information, analyzes it, and assimilates it in order to provide targeted advertisements to

13   businesses such as Sharp." *Id.* ¶ 29. Indeed, Meta "could not create Custom and

14   Lookalike Audiences without first viewing and analyzing Plaintiffs' and Class Members'

15   confidential information." *Id.* ¶ 174. Thus, "upon information and belief, Meta regularly

16   viewed and used the sensitive health information collected by the Meta Pixel in

17   connection with providing targeted advertising." *Id.* ¶ 29.

18           While Sharp characterizes the FAC as premised on "layers of speculation," (Mot.

19   at 22) Sharp's actual grievance is with Plaintiffs' description of Meta's operations. On a

20   motion to dismiss, Plaintiffs' description of the technology must be accepted as true as

21   long as the allegations "include enough details about the subject-matter of the case to

22   present a story that holds together. At this pleading stage, we do not ask whether these

23   things actually happened; instead, the proper question to ask is still could these things

24   have happened." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind*., 786

25   F.3d 510, 526 (7th Cir. 2015); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If

26   there are two alternative explanations, one advanced by defendant and the other

27   advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a

28   motion to dismiss under Rule 12(b)(6)."); *Pruitt v. Par-A-Dice Hotel Casino*, 2020 WL

17

5118035, at *3 (C.D. Ill. Aug. 31, 2020) (finding that on motion to dismiss, plaintiffs did not need to allege "how they knew [d]efendants were conducting facial geometry scans or plead technical details about the devices or software used."). In any event, Plaintiffs are permitted to allege upon information and belief that Meta's personnel regularly view data collected via the Pixel in connection with targeted marketing, including Plaintiffs' specific data. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (*Twombly* "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant").

At this stage, Plaintiffs have alleged sufficient facts to state a claim under the CMIA; to the extent Sharp contends otherwise, the facts "will come to light through discovery." *Pruitt*, 2020 WL 5118035, at *3.

## C.   Plaintiffs State a Plausible Claim for Intrusion Upon Seclusion

The Court held in its prior Order that "Plaintiffs do sufficiently plead that an alleged disclosure of sensitive health information on Sharp's appointment scheduling page is 'highly offensive.'" ECF No. 20, p. 11 (citing *Katz-Lacabe v. Oracle Am., Inc.*, No. 22-cv-04792-RS, 2023 WL 2838118, at *7 (N.D. Cal. Apr. 6, 2023)).[10] On the other hand, the Court found that "alleged disclosures made during routine browsing activity [do not] rise to the level of 'highly offensive.'" *Id*. The Court therefore dismissed Plaintiffs' common law claim of tortious intrusion upon seclusion only to the extent it is based on "routine browsing activity." *Id*.

The Court's prior ruling squarely frames the remaining issue of what, if any, of

---

[10] Sharp attempts to avoid this ruling by complaining that the FAC alleges that only Plaintiff Camus used Sharp's appointment scheduling page and does not specify what sensitive health information she shared to book her appointment. Mot. at 17. But Sharp contradicts that assertion by adding in its next breath, arguing that disclosure of Plaintiff Camus' information was not "highly offensive." *Id*. Regardless, Sharp's effort fails because it defies the Court's unequivocal holding that disclosure of the information Plaintiffs allege was shared on that page is "highly offensive." ECF No. 20 p. 12.

Plaintiffs' activity on Sharp's website, in addition to using the appointment scheduling page, lies outside the ambit of "routine browsing activity." Plaintiffs' additional allegations in the FAC compel the conclusion that, at the pleading stage, the disclosure of their medical conditions, treatments, and physicians is "highly offensive."[11]

The Ninth Circuit's analysis and holding in *Facebook Tracking*, which considered facts substantially similar to those alleged by Plaintiffs, are particularly instructive. There, users of Meta's social networking website similarly alleged that their browsing histories were improperly tracked and compiled into personal profiles sold to advertisers. *Facebook Tracking*, 956 F.3d at 596. The Ninth Circuit explained that  "[d]etermining whether a defendant's actions were 'highly offensive to a reasonable person' requires a holistic consideration of factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, the intruder's motives and objectives, and whether countervailing interests or social norms render the intrusion inoffensive." *Id.* at 606 (quoting *Hernandez v. Hillsides, Inc*., 47 Cal. 4th 272, 287 (2009)). This "analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." *Id.* (noting that highly offensive analysis "essentially involves a 'policy' determination as to whether the alleged intrusion is highly offensive under the particular circumstances").

Given that this fact-intensive, policy-driven inquiry should seldom be decided on a motion to dismiss, the Ninth Circuit concluded that "[t]he ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage." *Id*. While Sharp

---

[11] "Courts are generally hesitant to decide claims of this nature at the pleading stage." *In re Meta Pixel Healthcare Litig*., 2022 WL 17869218, at *15. In particular, the question of "[w]hether the conduct was highly offensive can *rarely* be resolved at the pleading stage." *In re Google RTB*, 606 F. Supp. 3d at 946 (emphasis added) (citing *Facebook Tracking*, 956 F.3d at 606 ("*Facebook Tracking*"); *accord Pioneer Electronics, Inc. v. Sup. Ct. of L.A*., 40 Cal. 4th 360, 370 (2007) (holding that only if a party's allegations "show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law.").

may take a microscope to *Facebook Tracking* in a search for supposed factual distinctions, any reasonable reading of the opinion finds that its holding applies equally to the FAC. Indeed, the holding applies *a fortiori* here because Plaintiffs specifically allege the disclosure of their sensitive medical information, which is "an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 41 (1994). Plaintiffs' allegations thus present a far more egregious invasion of privacy than alleged in *Facebook Tracking*. Here, Plaintiffs never authorized *any* tracking of their healthcare data, which is inherently more private than social media surfing.[12]

In the very recent words of one judge who denied a motion to dismiss a common law intrusion upon seclusion claim, "Personal medical information is understood to be among the most sensitive information that could be collected about a person, and I see no reason to deviate from that norm." *Doe v. Regents*, 2023 WL 3316766, at *6 (citing *Doe v. Beard*, 63 F. Supp. 3d 1159, 1169–70 (C.D. Cal. 2014)). Other decisions denying motions to dismiss similar intrusion claims also emphasize the sensitive nature of the disclosed medical information. *See, e.g.*, *Katz-Lacabe*, 2023 WL 2838118, at *7–8 (finding allegations that plaintiffs' data included "sensitive, health-related types of personal information" sufficient); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1299 (S.D. Cal. 2020) ("Plaintiffs have plausibly pled facts that could give rise to the inference that their medical information has been viewed by an unauthorized third party"); *Ruiz v. Podolsky*, 50 Cal. 4th 838, 850–51

---

[12] *Facebook Tracking* also rejected the argument, echoed by Sharp here, that successfully pleading an intrusion claim requires a plaintiff to specify the sensitive information collected, and that a general allegation of acquiring a large volume of individualized data is insufficient. The court found allegations that Facebook acquired sensitive browsing histories used to construct personalized user profiles sufficient to plead a reasonable expectation of privacy. *Facebook Tracking*, 956 F. 3d at 604. Plaintiffs allege the same here. *See, e.g.*, FAC ¶ 3 (alleging patient information aggregated to compile personalized dossiers).

(2010) (stressing "substantial privacy concerns" associated with "the disclosure of confidential medical information regarding the condition a patient seeks to treat.")

The special nature of confidential medical information is evident in another decision that explicitly distinguished between the use of a healthcare website from routine browsing. In *Purvis v. Aveanna Healthcare, LLC*, the court found that the relationship a pediatric home-care provider and families using its services "was different from *standard consumer transactions* insofar as it necessarily entailed the patient-Plaintiffs sharing and disclosing private health information with Defendant that was akin to the health information that would be communicated to a physician when receiving medical care." 563 F. Supp. 3d 1360, 1383 (N.D. Ga. 2021) (emphasis added) (dismissing intrusion claim in data breach case for lack of facts alleging defendant's active participation).[13] This is not the rare case where the operative facts and policies dictate a finding that Sharp's conduct had such "an insubstantial impact on privacy interests" that offensiveness should be adjudicated on the pleadings as a matter of law. *Pioneer Electronics*, 40 Cal. 4th at 370.

The cases cited by Sharp are distinguishable. In *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012), the court determined that collecting and revealing a LinkedIn user's browsing history and personal information was "routine commercial behavior" and therefore not highly offensive. *Id*. at 1025. As that court described, "LinkedIn is a web-based social networking site that presents itself as an online community offering professionals ways to network." *Id*. at 1016. In other words, the very purpose of LinkedIn is to *disseminate personal information*. Any offensiveness of disclosing information intended for public consumption pales in comparison to the offensiveness of disclosing information intended only for a healthcare provider. Similarly, *In re iPhone Application Litig*., users of Apple mobile devices alleged Apple

---

[13] *See also* cases cited *supra* note 12 and note 5.

improperly disclosed data entered into software applications it controlled. 844 F. Supp. 2d 1040, 1049–1050 (N.D. Cal. 2012) (dismissing claim for violation of Article I, Section 1 of the California Constitution). Unlike Plaintiffs, those users understood they were interacting with a commercial platform, not a hospital. Plaintiffs here had no such understanding or expectation when sharing medical information with their healthcare provider's website. To the contrary, Plaintiffs reasonably expected that Sharp would not disclose their medical information to a third-party without their express authorization. The same is true of *In re Google, Inc. Privacy Policy Litig.*, a case encompassing the entire spectrum of searches conducted on Google products. Google, of course, is synonymous with web browsing, used by "billions of consumers around the world." 58 F. Supp. 3d 968, 973 (N.D. Cal. 2014). As such, in all of the cases Sharp relies upon, users indiscriminately handed their information to mammoth commercial enterprises that profited mightily from the browsing they facilitated. Holdings that the disclosures by those three commercial entities were found not to be "highly offensive" shine little light on Plaintiffs' vastly different use of their hospital's website to schedule medical treatment and care.

Here, Plaintiffs and Class members used Sharp's website to search for medical providers, book appointments, and otherwise seek treatment, and they allege that they entrusted Sharp, their medical provider, with their highly sensitive medical information during that process. *See* FAC ¶¶ 1, 30–31, 66–91, 126, 130. The specific medical information disclosed to Meta included their medical conditions, appointments, diagnoses, treatment status, and reason for requesting a doctor's appointment. *Id*. Indeed, Sharp disclosed this sensitive information to Meta despite its own promise to safeguard its patients' sensitive health information. *Id*. ¶ 5 (quoting Sharp's promise to patients that "information about [patients] and [patients'] health is confidential."). The FAC thus cures each of the shortcomings of Plaintiffs' intrusion upon seclusion claim identified by the Court in its prior Order.

These allegations also distinguish this action from *Kurowski v. Rush System for*

*Health*, on which Sharp again misplaces reliance. In evaluating intrusion upon seclusion claims under Illinois law (not California law), the *Kurowski* court found that the hospital did not intrude upon its patients' seclusion when it allowed third-party to collect patient information data. No. 22 C 5380, 2023 WL 2349606, at *9 (N.D. Ill. Mar. 2, 2023). In reaching this holding, the court concluded that "actual intrusion upon patients' seclusion, via interception of their communications" was carried out by third parties, not the hospital. *Id.* However, the *Kurowski* court never addressed whether the hospital's actions were highly offensive to a reasonable person, the very proposition for which Sharp relies upon the case for. *See id.*; Mot. at 17. *Id*. Given that Sharp cites *Kurowksi* for a proposition that it did not address or analyzes, this Court should disregard *Kurowski* as persuasive authority on this issue.[14]

In sum, the facts alleged in the FAC, together with inferences that can reasonably be drawn from them, plausibly plead that Sharp's disclosure of Plaintiffs' medical information on its website, webpages, and appointment scheduling page to Meta is highly offensive. Sharp's contention to the contrary turns on a close examination of the facts that should not be assessed on a motion to dismiss.

## V.   CONCLUSION

For the foregoing reasons, Sharp's Motion to Dismiss should be denied in its entirety.[15]

---

[14] The *Kurowski* court reasoned that under Illinois law any "actual intrusion upon patients' seclusion, via interception of their communications, is carried out by third parties." *Kurowski*, 2023 WL 2349606, at *9. Sharp incorrectly asserts that the *Kurowski* court's passing comment that the plaintiff's "online communications were 'not protected private health information'" was a "separate ground" for dismissing the intrusion claim. Mot. at 17. But the court held flatly that there was no intrusion by the defendant. The nature of the patient's information and the level of offensiveness was not considered.

[15] Due to the federal holiday on October 9, 2023 and its potential impact on Plaintiffs' response deadline, Plaintiffs conferred with Defendant and obtained Defendant's agreement to consider the response timely if filed today.

1
2
3

Dated: October 9, 2023

**LYNCH CARPENTER LLP**

4

By:   */s/*Todd. D. Carpenter

5

Todd D. Carpenter (SBN 234464)
todd@lcllp.com
1350 Columbia St., Ste. 603
San Diego, CA 92101
Tel.:   619-762-1900
Fax:   619-756-6991

6
7
8
9

Nicholas A. Colella
nickc@lcllp.com
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel.:   412-322-9243

10
11
12
13
14

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Christopher E. Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Deborah De Villa (SBN 312564)
ddevilla@wolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Tel.:   310-474-9111
Fax:   310-474-8585

15
16
17
18
19
20
21
22

Alexander E. Wolf (SBN 299775)
awolf@milberg.com
John J. Nelson (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel:   858-209-6941

23
24
25
26
27
28

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jason S. Hartley (SBN 192514)
hartley@hartleyllp.com
Jason M. Lindner (SBN 211451)
lindner@hartleyllp.com
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
Tel:   619-400-5822

*Counsel for Plaintiffs and the Putative
Class*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 3:22-CV-02040-MMA-DDL